356 So.2d 276 (1978)
STATE of Florida, Appellant,
v.
Larry LEE, Appellee.
STATE of Florida, Appellant,
v.
Illanos G. JULIO, Appellee.
Nos. 52076 and 52190.
Supreme Court of Florida.
February 23, 1978.
*278 Robert L. Shevin, Atty. Gen. and Joseph W. Lawrence, II, Asst. Atty. Gen., Tallahassee, for appellant.
Jack O. Johnson, Public Defender and James A. Cornelius, Asst. Public Defender, Bartow, for Larry Lee.
Catherine L. Dickson and Ed L. Harvey, Asst. Public Defenders, Tallahassee, for Illanos G. Julio.
Robert Berner Lester, III, Tallahassee, for Bill Gunter, Insurance Commissioner and Treasurer, amicus curiae.
Marion R. Shepard and Vincent J. Rio, III of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, for John E. Mathews, Jr., amicus curiae.
D. Stephen Kahn and Paul W. Lambert, Tallahassee, for Legislators Brantley, Barron, Forbes, Gallen, Glisson, MacKay, McClain, Poston, J. Thomas, P. Thomas, Ware and Zinkil, amici curiae.
Paul B. Steinberg and Bruce M. Singer of Steinberg & Sorota, Miami Beach, for Insurance Underwriters Unlimited, Inc., a Florida Corporation, amicus curiae.
Louis de la Parte, Jr., Tampa, for AAA Motor Clubs of Florida, amici curiae.
PER CURIAM.
We have for review consolidated appeals from orders of the county courts of Polk and Gadsden Counties, holding Section 42 of the Florida Insurance and Tort Reform Act of 1977, Chapter 77-468, Laws of Florida, unconstitutional. On September 7, 1977, we rendered a decision in this cause affirming the judgments of the trial courts and holding Section 42 unconstitutional. We retained jurisdiction to fully articulate the reasons for its unconstitutionality and invited the parties and amicus curiae to submit briefs on the question of whether the unconstitutionality of Section 42 required a holding that the entire Act was unconstitutional.
We now hold that Section 42 is unconstitutional on the grounds that (i) it improperly uses the police power to take private property from one group of individuals solely for the benefit of another limited class of individuals; and (ii) it violates the Equal Protection Clause of the United States and Florida Constitutions in that it constitutes an irrational classification. We reject the contention that the entire Act is unconstitutional because it violates Article III, Section 6, of the Constitution which mandates that a law must embrace one subject matter. We further find that Section 42 is properly severable from the other provisions of the Act.
We first must articulate the reasoning behind our holding Section 42 unconstitutional. Section 42 provides for the establishment of a "Good Drivers' Incentive Fund" with the stated legislative purposes of encouraging safe driving and discouraging the abuse of driving privileges. Under this section, additional civil penalties are assessed for certain traffic violations. These additional penalties are collected by county clerks and remitted to the Department of Highway Safety and Motor Vehicles for deposit into the fund. The fund then operates in the following manner:
Section 42. Good Drivers' Incentive Fund. 
* * * * * *
(5) Beginning July 1, 1978, and at the beginning of each fiscal year thereafter, all money in the fund after deduction of the costs of administration of the fund shall be distributed to persons who have:

*279 (a) Been licensed to drive in Florida;
(b) Received no convictions as specified in subsection (4) or convictions arising out of a motor vehicle accident during the preceding 12 months; and
(c) 1. Purchased and maintained continuously for 12 months on a voluntary basis bodily injury liability insurance of at least $10,000 because of bodily injury to, or death of, one person in any one accident, and, subject to said limits for one person, in the amount of $20,000 because of bodily injury, or death of, two or more persons in any one accident; or
2. Established voluntarily with the department financial responsibility by one of the alternative methods set forth in s. 324.031(2), (3), or (4). [The three alternative methods are (1) posting a surety bond with the Department of Insurance; (2) furnishing a certificate from the Department of Insurance showing a cash deposit of $25,000, or a deposit of securities of like market value; or (3) furnishing a certificate of self insurance issued by the Department of Insurance.] Chapter 77-468, Section 42(5), Laws of Florida.
Unquestionably, the legislature, through the exercise of the state's police powers, has the right to establish fines or penalties to be paid by those individuals who violate the state's traffic laws. The state's police powers, however, are not absolute and any legislation resting on the police power, to be valid, must serve the public welfare as distinguished from the welfare of a particular group or class. United Gas Pipe Line Co. v. Bevis, 336 So.2d 560 (Fla. 1976); Liquor Store, Inc. v. Continental Distilling Corporation, 40 So.2d 371 (Fla. 1949).
Appellant contends that Section 42 serves the public welfare by providing an incentive for those persons operating motor vehicles in this state to utilize the privilege in a safe and financially responsible manner, and, at the same time, by providing a disincentive to those who would abuse such privilege. Appellant argues that this public purpose protects Section 42 from a successful constitutional attack. We disagree.
Our analysis of Section 42 reflects that, no matter how beneficial the public purpose behind its enactment, the distribution of a portion of the fines to a limited group of private persons makes it an improper use of the police power of the state. Section 42 has potential benefit for only a very limited class of private individuals. The class of persons who are entitled to receive a distribution from the fund does not even include all "good" drivers within the state, but includes only those operators of motor vehicles who meet the restrictive qualifications of Section 42(5).
We recognize that legislation is not always invalid because it benefits a limited group. We further recognize that the state does have the power to levy fines against those who violate the state's traffic laws to the extent necessary to protect the public welfare. Section 42, however, does not fall within the category of valid legislation benefiting a limited group, and it is not saved by any public purpose which may have prompted its enactment. The state's police power cannot be invoked to distribute collected funds arbitrarily and discriminatorily to a special limited class of private individuals. For the reasons expressed, Section 42 is in itself unconstitutional.
Somewhat akin to the foregoing impediment in the law is its deficiency under the Equal Protection Clause of the Constitutions of Florida and the United States. The classic criterion for assessing the validity of a statutory classification is whether that classification rests upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. See Ohio Oil Co. v. Conway, 281 U.S. 146, 50 S.Ct. 310, 74 L.Ed. 775 (1929). Stated another way "in order for a statutory classification not to deny equal protection, it must rest on some difference that bears a just and reasonable relation to the statute in respect to which the classification is proposed." Gammon v. Cobb, 335 So.2d 261, 264 (Fla. 1976). Accord, *280 Rollins v. State, 354 So.2d 61 (Fla. 1978). The question, then, is whether the classification made by the legislature in Section 42 is reasonable. We conclude that it is not.
The purpose of the legislature in enacting Section 42 is easily determined for it is stated concisely within the body of the law. Its purpose is to provide "an incentive for those persons operating motor vehicles in this state to utilize the privilege of operating such motor vehicles in a safe and financially responsible fashion and at the same time to provide a disincentive to those who would abuse such privilege." To accomplish this purpose, the legislature elected to amend Chapter 316, Florida Statutes, which sets forth the fines and penalties prescribed for violation of the state's traffic code, by increasing the amount of the fines and penalties, and to create a "Good Drivers' Incentive Fund" to reward safe drivers.
An examination of Section 42 will reveal that the legislature has divided the licensed drivers of automobiles in Florida into two classes. One class consists of licensed drivers who have received no convictions for moving traffic violations and who maintain bodily injury liability insurance or an acceptable substitute. These drivers are the "good drivers" and receive benefits from the "Fund." The second class is comprised of licensed drivers who have received as few as one single conviction for a moving traffic violation but who have also maintained bodily injury liability insurance or an acceptable substitute. These drivers are the "bad drivers" and they are prohibited from receiving the benefits to be dispensed from the "Fund." Are those classified as "bad drivers," in fact, unsafe drivers simply because they have violated one of the enumerated sections of Chapter 316, Florida Statutes? If so, then to separate them into a class apart from "good drivers" and to deny them the benefits of the "Good Drivers' Incentive Fund" would reasonably relate to the purpose of Section 42 to encourage the operation of motor vehicles in a safe fashion and to provide a disincentive to those who would abuse their driving privilege. Accordingly, is a single violation by a licensed driver of one of the many sections of the traffic code listed in Section 42 a reasonable basis for showing that such driver has abused his privilege to drive? We think not. Furthermore, virtually all of the traffic violations set out in Section 42 are minor violations which have been decriminalized by the enactment of Chapter 318, Florida Statutes,[1] and many of the violations are not reasonably related to safe driving.
Black's Law Dictionary definition of the verb "abuse" is:
To make excessive or improper use of a thing; to make an extravagant or excessive use, as to abuse one's authority.
This Court has held that to "abuse power" is to use it in an extravagant manner, to employ it contrary to the law of its use, or to use it improperly and to excess. Swenson v. Cahoon, 111 Fla. 788, 152 So. 203 (1933). By definition, it is apparent that a single conviction for a minor traffic violation which has been decriminalized cannot constitute an abuse of the privilege to drive an automobile by an otherwise responsible driver.
More importantly, many of the moving traffic violations catalogued in Section 42, conviction of which prohibits a driver from *281 enjoying the benefits of the "Fund," are in no way related to the driver's efforts to drive his automobile safely. For example:
Section 316.056, Florida Statutes,  "It is unlawful to tear down or deface any detour sign...." (Prohibition here is not unsafe driving, but actions of a pedestrian defacing state property.)
Section 316.061, Florida Statutes,  "The driver of any vehicle involved in an accident resulting only in damage to a vehicle or other property which is driven or attended by any person shall immediately stop such vehicle at the scene of such accident ... and in every event shall remain at the scene of the accident until he has fulfilled the requirements of § 316.062." (Obviously, this violation does not relate to the driver's ability to drive safely, but rather to his responsibilities after an accident has occurred, even when he is absolutely without fault in causing the accident.)
Section 316.095, Florida Statutes,  "No driver of any vehicle other than an authorized emergency vehicle on official business shall follow any fire apparatus traveling in response to a fire alarm closer than 500 feet or drive into or park such vehicle within the block where fire apparatus has stopped in answer to a fire alarm." (The prohibition here is to prevent the frustration of fire fighting activities, not unsafe driving.)
Section 316.096, Florida Statutes,  "No vehicle shall be driven over any unprotected hose of a fire department when laid down on any street or highway, or private road or driveway, to be used at any fire or alarm of fire, without the consent of the fire department official in command." (This violation also relates to the hindrance of firefighters in their activities rather than safe driving.)
Section 316.102, Florida Statutes,  "It is unlawful to operate upon any hard surfaced road in this state any log cart, tractor, or well machine; any steel tired vehicle other than the ordinary farm wagon or buggy; or any other vehicle or machine that is likely to damage a hard surfaced road except to cause ordinary wear and tear on the same." (Obviously the intent of this section is to prohibit physical damage to highways not to define unsafe driving practices.)
Section 316.104(2), Florida Statutes,  "It is unlawful to allow any vehicle or contrivance or any part of same, or any load or portion of a load carried on the same, to drag upon any street or highway." (Again the intent is to prohibit physical damage to highways.)
Section 316.104(4), Florida Statutes,  "It is unlawful for any vehicle to be equipped with any solid tires or any airless type tire on any motor-driven vehicle when operated upon a highway." (The intent of this section is similar to that of the preceding section.)
The arbitrary classification of drivers based on their conviction of one of the traffic violations set out above or a similar violation bears no reasonable relation to the purpose of Section 42.
Furthermore, under the provisions of Section 42 it is possible for a person to be placed in the "bad driver" class even though he was not driving his automobile at the time of the violation. The provisions of Section 316.206, Florida Statutes, require that an owner of a vehicle who permits his vehicle to be driven in violation of the section is also guilty of violating the section. Thus, a moving traffic violation as defined by Section 42 may be vicariously imputed to a motor vehicle owner who was not physically present at the time or place of the moving violation.
We cannot distinguish the classification imposed by Section 42 from others which have been held by this Court to be unreasonable and discriminatory. For example, in Seaboard Air Line Ry. v. Simon, 56 Fla. 545, 47 So. 1001 (1908), this Court held invalid a statute which imposed the legal duty on the operators of railroads to pay for goods lost or injured in transportation, but exempted all other common carriers from such duty. It was held that a statute making such a regulation applicable only to railroads created an unreasonable classification *282 which denied railroad companies equal protection of the laws. In State v. Blackburn, 104 So.2d 19 (Fla. 1958), a statute forbidding the display of signs advertising the price of gasoline by gas station operators within 15 feet of the right-of-way of any public street was held to be constitutionally invalid. It was ruled that dealers in gasoline could not be singled out for regulation while dealers in other products attractive to motorists were not prohibited from so advertising their products. The Court determined that the purpose of the statute was to eliminate the danger to the public of distracting the attention of the driver. Justice Thomas observed that:
The lack of substantial reason to impose the conditions on the one class of retailers specified and on but one type of sign maintained by that class renders the pertinent part of the law invalid. 104 So.2d at 21.
A similar conclusion was reached in Gammon v. Cobb and Rollins v. State, supra. The former decision dealt with an unreasonable classification for illegitimate children and the latter related to operators of billiard parlors. The reasoning iterated in each of the foregoing decisions of this Court is equally applicable to Section 42 and, consequently, the same result must obtain.
The next constitutional issue that must be addressed concerns the contention that the entire Act is unconstitutional on the ground that it violates the constitutional directive that a law "shall embrace but one subject and matter properly connected therewith." Article III, Section 6, Florida Constitution.
Appellee Julio contends that Chapter 77-468 is a statute which contains at least two separate subjects, insurance and tort reform, in addition to other matters which are not properly connected to either subject. Although Chapter 77-468 is a broad and comprehensive legislative enactment, we must disagree with appellees' contentions.
The purpose of the constitutional prohibition against a plurality of subjects in a single legislative act is to prevent a single enactment from becoming a "cloak" for dissimilar legislation having no necessary or appropriate connection with the subject matter. E.g., Colonial Inv. Co. v. Nolan, 100 Fla. 1349, 131 So. 178 (1930). This constitutional provision, however, is not designed to deter or impede legislation by requiring laws to be unnecessarily restrictive in their scope and operation. See State ex rel. X-Cel Stores, Inc. v. Lee, 122 Fla. 685, 166 So. 568 (1936). This Court has consistently held that wide latitude must be accorded the legislature in the enactment of laws, and this Court will strike down a statute only when there is a plain violation of the constitutional requirement that each enactment be limited to a single subject which is briefly expressed in the title. Farabee v. Board of Trustees, 254 So.2d 1 (Fla. 1971); Rouleau v. Avrach, 233 So.2d 1 (Fla. 1969).
The subject of a law is that which is expressed in the title, Rouleau, supra, at 4; Ex parte Knight, 52 Fla. 144, 41 So. 786 (1906), and it may be as broad as the legislature chooses provided the matters included in the law have a natural and logical connection. Board of Public Instruction of Broward County v. Doran, 224 So.2d 693 (Fla. 1969).
Applying the above-stated principles, we conclude that the Act before us deals with only one subject. Chapter 77-468 is an attempt by the legislature to deal comprehensively with tort claims and particularly with the problem of a substantial increase in automobile insurance rates and related insurance problems. Sections 38-41 of Chapter 77-468 concern certain aspects of tort litigation, but these sections relate primarily to tort litigation arising from automobile negligence. Given the profound effect of tort litigation on all phases of the automobile insurance industry, we cannot say that tort law and automobile insurance have no logical connection.
The legislature, in enacting Chapter 77-468, has dealt comprehensively with a broad subject, but we cannot say that appellees have demonstrated a plain violation of Article III, Section 6, of the Constitution. Prior *283 comprehensive enactments by the legislature demonstrate that widely divergent rights and requirements can be included without challenge in statutes covering a single subject matter. For example, the recently enacted Probate Code encompasses a wide range of rights, penalties, and forfeitures in a single legislative enactment. Chapter 75-220, Laws of Florida. With the presumption of validity that Chapter 77-468 carries with it, we must give the legislature the benefit of the doubt.
The appellees make at least seven other constitutional assaults on Section 42. In view of our finding, we need not address those contentions.
The final issue concerns the question of whether Section 42 is properly severable from the remaining portions of Chapter 77-468. In resolving the issue of severability, this Court has consistently applied the tests set forth in Cramp v. Board of Public Instruction of Orange County, 137 So.2d 828 (Fla. 1962):
When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken. .. . 137 So.2d at 830.
Chapter 77-468 was designed to accomplish several objects. Section 42 was intended principally to lower the frequency of traffic violations. The remaining sections of the Act relate to reforms in insurance rates and coverage as well as reforms in certain aspects of tort litigation. The legislative purposes behind the enactment of the remaining portions of the Act, although related, can be accomplished independently of Section 42. The remaining sections are not inseparately connected with or contingent on Section 42.
Further, there is no evidence to demonstrate that the legislature would not have passed the other provisions had it known that Section 42 would fall. In fact, the evidence of legislative intent points to the contrary. Section 44 of Chapter 77-468 declares that the legislature intended each section to be severable from the remaining portions of the Act.
We hold that Section 42 is properly severable from the remaining sections of Chapter 77-468. In so doing, however, we express no opinion as to the constitutionality of each of the remaining sections of Chapter 77-468.
The judgments of the trial courts holding that Section 42 is unconstitutional are affirmed. That portion of the judgment of the County Court of Gadsden County which held the entire Chapter 77-468 unconstitutional, however, is reversed. The funds collected pursuant to Section 42 should be refunded to the extent possible without cost to the original payor.
It is so ordered.
OVERTON, C.J., ADKINS and BOYD, JJ., and MASON, Circuit Judge (Retired), concur.
ENGLAND, J., concurs in part and dissents in part with an opinion, with which SUNDBERG, J., concurs.
SUNDBERG, J., concurs in part and dissents in part with an opinion, with which ENGLAND and HATCHETT, JJ., concur.
ENGLAND, Justice, concurring in part and dissenting in part.
While I support the Court's invalidation of Section 42, I cannot agree with my colleagues' determination that Section 42 is severable from the other provisions of this 1977 statute.
Following the entry of our September 7 order declaring Section 42 invalid, we invited interested parties to brief for us the question of whether Section 42 is severable from other provisions of Chapter 77-468. *284 In response to our request we received helpful briefs on both sides of the issue.[1] A point of common agreement among those responding is that the so-called "severability clause" which appears as Section 44 of the Act[2] does not control our determination, but simply assists the Court in ascertaining the legislative intent. See Small v. Sun Oil Co., 222 So.2d 196, 199-200 (Fla. 1969).[3]
The tests for severability have been variously cast as whether the statute would have been enacted without the invalid provision,[4] whether the unaffected portions of the statute would produce a result never contemplated by the Legislature,[5] whether the unaffected portions are complete, sensible and wholly independent of the invalid provision,[6] and whether the invalid provision was an inducement to the enactment of the other provisions.[7] The touchstone for severability under each of these formulations, however, is the "intent" of the Legislature with respect to the enactment as a whole.
In the present case I am persuaded that the Legislature enacted the Good Driver's Incentive Fund as an inducement to another key provision of the statute  the elimination of mandatory insurance coverage for Florida motorists (other than $5,000 of personal injury protection). Viewed in a different light, I am convinced that the resulting legislation would not have been enacted without some "trade-off" like Section 42 to induce motorists to secure financial responsibility for motor vehicle mishaps. Put another way, the consequence of allowing the legislation to stand without Section 42 would be a result the Legislature never intended.
The interdependence of Section 42, diminished financial responsibility, and the statutory adjustments to the fault system of litigating motor vehicle torts is readily apparent from a mere reading of this comprehensive statute.[8] It is also easily illustrated from the legislative history of the Act. Chapter 77-468 began as Senate Bills 792, 925, and 1181. The initial bills were modest and innocuous, in no way resembling the final enactment. They followed this path through the 1977 regular session of the Florida Legislature:
*285 1. On April 19, SB 792 was introduced and referred to the Judiciary-Civil Committee and to the Commerce Committee. SB 925 was introduced and referred to the Commerce Committee on April 22, and SB 1181 was introduced and referred to the Commerce Committee on April 28.
2. On April 29, SB 792 was recommended for passage by the Judiciary-Civil Committee.
3. On May 17, a Committee Substitute for the three bills was recommended for passage by the Commerce Committee. This comprehensive statute marked the first appearance of a "good driver's fund".[9]
4. On May 18, CS for SBs 1181, 925 and 792 was passed by the Senate and sent to the House, as amended to change the use of the good driver fund from premium reductions to direct distribution to certain policy holders.[10] An amendment to strike the fund provision of the bill failed.[11]
5. On May 24, CS for SBs 1181, 925 and 792 was introduced in the House and referred to the Commerce Committee.
6. On May 31, CS for SBs 1181, 925 and 792 was recommended for passage by the House Commerce Committee, with amendments, and passed by the House as amended. The good driver's fund, although altered in certain details, remained essentially intact.
7. On June 1, the Senate refused to concur in the House amendments and requested a conference committee; the House refused to recede from its amendments and House conferees were appointed.
8. On June 2, Senate conferees were appointed. On the following day, the conferees' report on the bill was adopted by both the Senate and the House, and the bill as amended as enacted by both bodies.[12]
Relevant to our concern from this history is the fact that all versions of the proposed legislation considered by the reviewing committees, by the full Senate and by the full House, contained as part of this complex insurance and tort package both a provision for diminished mandatory insurance coverage and a provision for some form of incentive rebate or refund designed to induce voluntary insurance purchases.
One can argue hypothetically that the object of this 1977 legislation was simply to reduce automobile insurance premiums.[13] It can nowhere be demonstrated, however, that the Legislature would have been willing to undertake that responsibility without also providing that persons injured in automobile accidents would be afforded a substitute form of protection.[14] The Good Driver's Incentive Fund provided the incentive for policyholders to purchase insurance protection in addition to that required by law.[15] I am convinced that the removal of *286 that incentive, without a concomitant removal of premium reduction provisions, would yield a result which was never contemplated by the Legislature.
SUNDBERG, J., concurs.
SUNDBERG, Justice, concurring in part and dissenting in part.
While I concur in the Court's conclusion that Section 42 of Chapter 77-468, Laws of Florida, is unconstitutional for the reasons stated in the majority opinion, I must respectfully dissent from that part of the opinion which finds Section 42 severable and upholds the balance of the Act. I have concurred with Justice England's observations concerning the non-severability of Section 42. However, I perceive a more basic infirmity in the entire Act which makes unnecessary any inquiry into the severability of Section 42.
The County Court of Gadsden County, Florida, in the case brought against Illanos G. Julio found Chapter 77-468 to be unconstitutional for the reasons, inter alia, that:
CS/SB 1181, 925 and 792 [Ch. 77-468, Laws of Florida] as a whole violates Article III, Section 6 of the Florida Constitution by embracing more than one subject.[1] The Act on its face, relates to insurance and tort reform while also regulating increased fines and/or penalties for certain traffic offenses. The matter of civil penalties and/or fines for certain traffic offenses is not fairly and naturally germane to the subject of insurance and tort reform, nor are such penalties necessarily incident to, or tend to make effective or promote the objects and purposes of the legislation included in the subject of the Act.
I agree with the county judge that the Act fails to comply with the mandate of Article III, Section 6 of our Constitution.
Chapter 77-468, Laws of Florida, was not enacted as a general revision or revisor's bill. Cf. Jones v. Christina, 184 So.2d 181 (Fla. 1966). It adds to or creates at least 18 sections of the Florida Statutes: repeals three sections; and directly amends 24 sections, several of these amendments being substantial revisions. Not counting two unnumbered new statutory sections, on its face it changes nine different chapters of the Florida Statutes (Chapters 11, 120, 320, 324, 325, 624, 626, 627, 768), ranging from "Legislative Organization, Procedures, and Staffing" to that portion of "Negligence" known as the "Florida Wrongful Death Act."
Among other things, the Act: changes duties of the Joint Legislative Management Committee (Section 2); amends the Administrative Procedure Act (Section 3); requires proof of personal injury protection insurance when motor vehicles are registered, and creates a new crime concerning such proof (Section 4); redefines the purpose of the Financial Responsibility Law and the definition of "motor vehicle" used in that law, while changing supervision of that law from the Department of Insurance to the Department of Highway Safety and Motor Vehicles (Sections 5 and 6); changes agencies responsible for filing certain accident reports and the circumstances in which licenses and registrations will be suspended (Section 7); revises accident security deposit procedures (Section 8); revises license and registration reinstatement procedures, and triples the reinstatement fee (Section 9); abolishes equitable apportionment among insurers and the requirement that proof of insurance be provided at vehicle inspections (Section 12); adds to requirements for departmental examination of insurers (Section 14); changes several aspects of insurance certification, reporting, regulation and rate-making (Sections 15 through 28); provides that a motor vehicle lessor's insurance shall ordinarily be primary (Section 29); changes uninsured motorist's coverage and eliminates pain and suffering damages unless the no-fault threshold is *287 met (Section 30); generally eliminates compulsory liability insurance for motor vehicles (Section 31); revises personal injury protection coverage (Sections 33, 37); changes the "collateral source" rule regarding motor vehicle accident suits (Section 34); prohibits punitive damages in actions against automobile liability insurers for damages exceeding policy limits (Section 35); substantially revises the civil and criminal law concerning fraudulent insurance claims and soliciting of motor vehicle tort claims by attorneys and others (Section 36); generally requires mandatory joinder of all personal injury claims and actions brought under Section 627.737, Florida Statutes (1975) (Section 38); generally precludes joinder of liability insurers in suits against insureds (Section 39); changes the definition of "minor children" in the Wrongful Death Act (Section 40); provides for mandatory trial court remittitur or additur in motor vehicle personal injury or wrongful death actions (Section 41); creates a "Good Driver's Incentive Fund" (Section 42); generally freezes rates for private passenger motor vehicle insurance effective June 4, 1977, until January 1, 1978 (Section 43); and establishes multiple effective dates (Section 45).
Stated another way the Act relates to at least three distinct and separate subjects, which may be categorized: (i) insurance and matters related thereto; (ii) tort law; and (iii) enhanced penalties for moving traffic violations. By the first line of the title it is acknowledged that Chapter 77-468 is "[a]n act relating to insurance and tort reform." CS/SB 1181, 925 and 792. The very scope of the Act with its effect on myriad aspects of our law is almost intimidating to judicial scrutiny. So pervasive is the reach of the legislation into so many subjects that one is reluctant to examine closely any part for fear that its invalidation will cause a domino effect upon programs and provisions which touch upon all sorts of subject matter within our statutes. Nevertheless, the consequences of a holding that this legislation violates Article III, Section 6, cannot be a consideration in exercising our judicial responsibilities.
But the uneasiness evoked in the judiciary in reviewing such multifaceted legislation is merely a symptom of the cause for which Article III, Section 6, was placed in our Constitution. A legislator in initially considering a bill should not be put to the choice of accepting provisions affecting a subject matter totally alien to provisions affecting a subject matter with which he is sympathetic. For example, it is clear that a subject such as abortion should not be combined with revision of the Uniform Commercial Code. The factors relevant to one are totally different to the considerations, moral and philosophical, bearing upon the other. An apt phrase has been applied to this constitutionally unacceptable practice  logrolling. See Lee v. Bigby Electric Co., 136 Fla. 305, 307, 186 So. 505 (1939). The rationale for such provisions as Article III, Section 6, is clearly expressed in Colonial Inv. Co. v. Nolan, 100 Fla. 1349, 131 So. 178, 179 (1930):
The object of this constitutional provision, which in substance has been placed in practically all of the constitutions of the several states, was to prevent hodgepodge, logrolling, and omnibus legislation. It had become quite common for legislative bodies to embrace in the same bill incongruous matters having no relation to each other, or to the subject specified in the title, by which means measures were often adopted without attracting attention. And frequently such distinct subjects, affecting diverse interests, were combined in order to unite the members who favored either in support of all. And the failure to indicate in the title the object of a bill often resulted in members voting ignorantly for measures which they would not knowingly have approved. And not only were members thus misled, but the public also; and legislative provisions were sometimes pushed through which would have been made odious by popular discussion and remonstrance if their pendency had been seasonably demonstrated by the title of the bill. Thus it was long since decided that these evils should be corrected by constitutional *288 provisions preventing such aggregations of incongruous measures by confining each act to one subject and matter properly connected therewith, which subject should be briefly expressed in the title. Lewis' Sutherland, Statutory Construction, § 3.
Accord, State v. Sullivan, 99 Fla. 1070, 128 So. 478 (1930).
Needless to say, there are degrees of germanity. It is the function of this Court to measure legislation against the constitutional mandate, when objection is raised, and assess whether the Act so abuses the organic provision as to be constitutionally impermissible. We have earlier cases of this Court to assist us in this task. My review of those authorities convinces me that Chapter 77-468 plainly exceeds the tolerable limits of propriety imposed by Article III, Section 6, Florida Constitution. While it is true that each case tends to go off on its own peculiar facts,[2] nonetheless certain guiding principles can be discerned from these earlier authorities.
The first of these is that Article III, Section 6, relates to the subject of legislation. Though some constitutional subject-title requirements command a unity of object,[3] the Florida Constitution requires that each law shall embrace one subject. By definition "[t]he subject is the matter to which an act relates; the object, the purpose to be accomplished." Wright v. Board of Public Instruction, 48 So.2d 912, 915 (Fla. 1950). Accord, Nichols v. Yandre, 151 Fla. 87, 9 So.2d 157 (1942); Spencer v. Hunt, 109 Fla. 248, 147 So. 282 (1933).
In defense of the Act the attorney general maintains that the legislation has a single general subject matter-automobile insurance coverage. But it must be readily apparent that, at best, this topic could only be construed as an object of the legislation and that multiple subjects are dealt with and recited in the title, i.e., insurance, torts, and traffic law. Ordinarily the word "subject" is a broader term than the word "object," as one subject may contain many objects. Spencer v. Hunt, supra. However, the reverse appears to be true here. The legislature may deal with the subject of insurance, or torts, or traffic regulation, independently, to accomplish any number of remedial purposes, including automobile insurance coverage. It may not, though, conglomerate these diverse subject matters in a single act under the auspices of dealing with automobile insurance coverage. The subjects which might be affected by the object of regulating automobile insurance coverage are so limitless and diverse that to accept the State's argument and convert this purpose to a single subject of legislation would be to completely emasculate Article III, Section 6 of our Constitution. For example, if the appellant's position were accepted, the fields of automobile manufacturing safety standards, automobile repair, traffic control devices, highway construction, delivery of medical services, hospital care and drug prices, to name a few, could all be dealt with in one act because they bear upon automobile insurance rates and coverage. The Act before us, in fact, intrudes into the areas of court practice and procedure as well as lawyer discipline and is justified, allegedly, by the fact that those matters affect insurance coverage and rates. In fine, pursuant to the constitutional mandate of Article III, Section 6, Florida Constitution, the question presented sub judice is not the germanity of the matters included in the measure, but whether multiplicity in subject matter is present. If but one subject were embraced in the title to Chapter 77-468, Laws of Florida, it would be appropriate to examine the body of the Act to determine if the provisions thereof are "matter[s] properly connected therewith (germane)." However, if distinct, unrelated and incongruous subjects are embodied in the title itself, it matters little that provisions *289 in the body of the Act are germane to one or more of the stated subjects in the title. Cf. McConville v. Fort Pierce Bank & Trust Co., 101 Fla. 727, 135 So. 392 (1931). The title should express only one subject. Colonial Inv. Co. v. Nolan, supra. The constitutional provision is mandatory. Boyer v. Black, 154 Fla. 723, 18 So.2d 886 (1944).
Although courts are naturally reluctant to invalidate a statute for defects in the title and will not do so except in clear cases free from every reasonable doubt,[4] nevertheless I am satisfied that the Act under review clearly fails to comply with the mandate of Article III, Section 6, Florida Constitution. If this legislation does not fall within the proscription of that section of our organic law, I cannot conceive of one that would. Obedience to the Constitution requires that this Act fall. As suggested by Justice Brown in Colonial Inv. Co. v. Nolan, supra, if an Act embraces two or more subjects, and two or more are expressed in the title, the whole Act is void. 131 So. at 180. This Court is not at liberty to choose between the several subjects and hold the Act valid as to one and void as to the others. See Lewis' Sutherland on Statutory Construction (2d ed. 1904) Section 144.
Accordingly, I would affirm the action of the trial court in ruling, inter alia, that Chapter 77-468, Laws of Florida, is invalid in its entirety for transcending the requirements of Article III, Section 6, Florida Constitution.
ENGLAND and HATCHETT, JJ., concur.
NOTES
[1] For the purposes of Section 42, the term "moving traffic violations" means an infraction of the following Florida Statutes:

§§ 316.029, 316.030, 316.040, 316.053, 316.054, 316.055, 316.056, 316.0565, 316.057(9), 316.061, 316.081, 316.082, 316.083, 316.084, 316.085, 316.086, 316.087, 316.088, 316.089, 316.090, 316.091, 316.092, 316.094, 316.095, 316.096, 316.098, 316.100(1), 316.102, 316.104(2) or (4), 316.107, 316.108, 316.109, 316.110, 316.1105, 316.113, 316.121, 316.122, 316.123, 316.125, 316.126(1) or (3), 316.133, 316.134, 316.138, 316.139, 316.151, 316.152, 316.153, 316.154, 316.155, 316.157, 316.158, 316.159, 316.162, 316.181, 316.182, 316.183, 316.184, 316.185, 316.186, 316.196, 316.197, 316.198, 316.205, 316.206, 316.217, 316.236, 316.238, 316.2431, or 339.30(1)(a), (b), (c), (d), (g), or (h).
All of the above sections have been decriminalized by the provisions of Chapter 318, Florida Statutes, except for the following: 316.029, 316.061, 316.028.
[1] In support of severability are the Attorney General, on behalf of the state, John E. Mathews, Jr., and state legislators Brantley, Barron, Forbes, Gallen, Glisson, MacKay, McClain, Poston, J. Thomas, P. Thomas, Ware and Zinkil, as friends of the Court. Urging invalidation of the entire statute are appellees and both Insurance Underwriters Unlimited, Inc., and AAA Motor Clubs of Florida, as friends of the Court.
[2] "Section 44. If any provision of this act, or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this act which can be given effect without the invalid provision or application. To this end the provisions of this act are declared to be severable."
[3] It has been suggested that severability clauses have become so commonplace that their significance should be considered minimal. See Kapaun v. Federal Land Bank of Omaha, 64 S.D. 635, 269 N.W. 564 (1936). While not "routine" in Florida, the use of such clauses has been fairly regular. In the 1975 regular session, the Legislature put a severability clause in 26 of its statutes. In 1976 a like clause was contained in 20 statutes, and in 1977 a like clause was contained in 30 statutes.
[4] Presbyterian Homes of Synod of Florida v. Wood, 297 So.2d 556, 559 (Fla. 1974); State ex rel. Limpus v. Newell, 85 So.2d 124, 128 (Fla. 1956); State v. Calhoun County, 127 Fla. 304, 311-13, 170 So. 883, 886 (1936).
[5] State ex rel. James v. Gerrell, 137 Fla. 324, 330, 188 So. 812, 815 (1939) (on rehearing); Hayes v. Walker, 54 Fla. 163, 168, 44 So. 747, 749 (1907).
[6] Kass v. Lewin, 104 So.2d 572, 577 (Fla. 1958); Greenblatt v. Goldin, 94 So.2d 355, 359 (Fla. 1957).
[7] State ex rel. West v. Hilburn, 70 Fla. 55, 61-62, 69 So. 784, 786 (1915); Dade County v. Keyes, 141 So.2d 819, 821-22 (Fla. 3d DCA 1962), cert. discharged, 152 So.2d 171 (Fla. 1963).
[8] For example, Section 4 of the Act (adding a new subsection 320.02(3), Fla. Stat.) requires car owners to furnish proof of personal injury protection insurance at the time of vehicle registration, and it prescribes "uniform proof of purchase" cards for that purpose. Paragraph 320.02(3)(a) of this provision, states these cards must also indicate the existence of any bodily injury liability insurance voluntarily purchased "as an aid in implementing Section 42."
[9] A "Statement of Substantial Changes Contained in Committee Substitute for Senate Bill 1181, 925, 792" was prepared for the Senate by the staff director of the Commerce Committee. The statement identifies substantial changes in the committee bill from the original bills, among other things, "in the reporting requirements currently used by motor vehicle insurance companies", in the abolition of "compulsory liability insurance, unless required under financial responsibility laws", "in tort law", in the establishment of "a good driver fund", and in rates ("A rate freeze would be imposed until 1/1/78."). As originally conceived, moneys in the fund would have been "distributed to insurers writing motor vehicle liability insurance in this state... to reduce premiums charged to policyholders... ."
[10] S.Jour. 438, 1977 Reg.Sess.Fla.Leg., amend. 16. The fund provision appeared as section 27 of the bill as enacted by the Senate.
[11] S.Jour. 444, 1977 Reg.Sess.Fla.Leg., amend. 42.
[12] S.Jour. 871 and H.R.Jour. 1243, 1977 Reg. Sess.Fla.Leg.
[13] Of course, the legislation had that effect. See § 324.011, Fla. Stat. (1977), as amended by Ch. 77-468, § 5, Laws of Fla.
[14] The Act expressly states the Legislature's intent to protect persons and property from motor vehicle mishaps. See § 5, amending § 324.011, Fla. Stat.
[15] By ensuring protection through voluntary insurance purchases, however, legislators could accurately represent that they had reduced the high insurance premiums required by law.
[1] Art. III, § 6, Fla. Const., provides in pertinent part:

"Every law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title... ."
[2] See Parker, Constitutional Law  The Legislative Subject Title Requirement, 9 M.L.Q. 431, (Summer 1955).
[3] E.g., La.Const., Art. III, § 16. For a case interpretative of the origin and application of this section, see Conley v. City of Shreveport, 216 La. 78, 43 So.2d 223 (1949).
[4] See State ex rel. Shevin v. Metz Construction Co., Inc., 285 So.2d 598 (Fla. 1973); State ex rel. Flink v. Canova, 94 So.2d 181 (Fla. 1957); McConville v. Fort Pierce Bank & Trust Co., supra.