402 So.2d 565 (1981)
Dirk Allan CARR, Appellant,
v.
CENTRAL FLORIDA ALUMINUM PRODUCTS, INC., and North River Insurance Company, Appellees.
No. WW-234.
District Court of Appeal of Florida, First District.
August 26, 1981.
*566 Larry Mark Polsky, Daytona Beach, for appellant.
Steven A. Rissman of Cooper & Rissman, P.A., Orlando, for appellees.
ROBERT P. SMITH, Jr., Chief Judge.
Carr appeals from a deputy commissioner's order denying him certain workers' compensation disability benefits for a thumb injury sustained in October 1979, after the 1979 amendments to the workers' compensation act, Chapter 440, Florida Statutes (1979) became effective. Although the injury left Carr physically impaired to the extent of 34 percent of the thumb and eight percent of the body according to a physician's estimate, the injury did not qualify Carr for "permanent impairment" benefits under Section 440.15(3)(a)1, which provides for a one-time payment up to $7,500 only to claimants suffering one of three types of permanent injuries: amputations, 80 percent or more vision loss, or serious head or facial disfigurement. Carr obviously does not fall into any of these special injury categories.
Carr contends that the 1979 statute violates his constitutional rights to equal protection,[1] due process,[2] and access to the courts for redress of injury.[3] Carr urges that we invalidate the 1979 statute and reactivate the prior and now repealed Chapter 440 benefits, entitling Carr to 60 weeks of compensation for a lost thumb, cf. State ex rel. Boyd v. Green, 355 So.2d 789 (Fla. 1978), or that we remit Carr to common tort law remedies in circuit court. We sustain *567 the 1979 statute under this constitutional challenge, and so affirm the deputy's decision that the benefits voluntarily paid appellant  medical and temporary disability payments  were all that were due.
Before 1979, Chapter 440 provided for recovery of permanent partial disability benefits based on a schedule for enumerated injuries and on the estimated degree of physical impairment or loss of wage-earning capacity in other cases. Section 440.15(3), Fla. Stat. (1977). In an effort to control high costs, inequitable awards, and delays in payment of claims,[4] the legislature in 1979 substituted "permanent impairment" benefits under Section 440.15(3)(a) and "wage-loss" benefits under Section 440.15(3)(b) for the disability benefits previously awarded for similar permanent injuries.
Addressing Carr's contention that the statutory classification offends the equal protection clause by denying him benefits for his permanently impaired thumb while granting benefits to those whose permanent impairment is by amputation, loss of 80 percent or more of vision, after correction, or serious facial or head disfigurement, Section 440.15(3)(a)1, our task is to determine whether the legislative classification was made on some reasonable basis, bearing a substantial relationship to a legitimate legislative purpose. Lasky v. State Farm Ins. Co., 296 So.2d 9, 18-20 (Fla. 1974). Statutory classifications need not be mathematically precise, and they need not address all aspects of a problem at once. In re Estate of Greenberg, 390 So.2d 40 (Fla. 1980).
The classification Carr complains of is not arbitrary but is grounded both in a reasonable contemporary view of the economic impact of amputations, sight loss, and head disfigurement, and in the history of workers' compensation legislation, which from the first presumed economic loss from injuries of this character. Seen in the context of a statutory purpose to compensate injured workers for actual wage loss rather than any longer for anatomic disability or loss of wage-earning capacity, the legislature has in effect presumed that these designated injuries will almost inevitably result in economic loss of the sort the legislature determined to compensate. Representative William Sadowski and senior aides to the House Insurance Committee, sponsors of the comprehensive 1979 workers' compensation legislation, contemporaneously expressed the legislature's rationale for extending special wage-loss benefits to the designated classes:[5]
Amputations. The severance of a limb produces economically disabling consequences, mental and physical, which are "of a different order from the reactions to the loss of use of a limb," among them being the reality and realization that natural function can never be restored.
Loss of sight. Despite the resourcefulness of sightless persons and the growing sensitivity of a sighted society, "Blindness or a very severe restriction of vision is also in a class by itself because the ability to see is necessary in so many occupations."
Severe facial and head disfigurement. These injuries, too, have a presumptive impact on working careers and therefore on wages. "Facial and head disfigurement is a special kind of disfigurement because in our society clothing does not cover it up."
Mr. Sadowski and his coauthors stated:[6]
The economic loss resulting from these injuries can be quantified on an actual wage-loss basis for the most part. But given the severity of these types of injuries, and given the very special kinds of problems associated with each, the legislature determined that some special recognition should be made apart from the *568 wage-loss benefits available to everyone. The actual monetary award in the new section 440.15(3)(a) is not very large, but the special recognition of those who are truly injured is there.
These legislative findings are wholly consistent in principle, and to some extent in detail, with early workers' compensation legislation that scheduled a short list of injuries deemed uniquely productive of wage loss, so much so as to foreclose all reasonable debate on the issue. See A. Larson, Workmen's Compensation Law § 57.14(c):
The historical evidence is quite clear that the schedule was never intended to be a departure from or an exception to the wage-loss principle. The typical schedule, limited to obvious and easily-provable losses of members, was justified on two grounds: the gravity of the impairment supported a conclusive presumption that actual wage loss would sooner or later result; and the conspicuousness of the loss guaranteed that awards could be made with no controversy whatever.
We conclude that scheduling these obviously significant injuries for special treatment is reasonably related to the legislature's purpose of making the benefit payment system more efficient by eliminating endless debates before deputy commissioners and the courts over exactly what percentage of use of a limb, for instance, has been lost in a given case. In Larson's view,[7] the addition of "partial loss of use" of body members to scheduled permanent injuries was responsible for much of the complexity and litigiousness that attended the system in recent years, which the Florida legislature sought in 1979 to obviate.
For similar reasons we conclude that Section 440.15(3)(a)1 does not violate due process. The measure bears a reasonable relationship to permissible legislative objectives and is not discriminatory, arbitrary, or oppressive. Lasky, supra, 296 So.2d at 15.
On a single page Carr's brief raises, though he scarcely argues, that the 1979 wage-loss scheme as a whole offends Article I, Section 21 of the Florida Constitution, guaranteeing access to courts, by not providing an adequate alternative to common law remedies or statutory remedies in existence when the Constitution was adopted. See Kluger v. White, 281 So.2d 1 (Fla. 1973). In view of the paucity of Carr's argument on the subject, we decline to recognize the issue as adequately raised for decision. Lynn v. City of Ft. Lauderdale, 81 So.2d 511, 513 (Fla. 1955); 5 C.J.S. Appeal and Error § 1324(3) at pp. 341-42 (1958).
AFFIRMED.
MILLS, J., concurs.
WENTWORTH, J., concurs specially with opinion.
WENTWORTH, Judge, concurring specially.
Appellant's argument before the deputy and in this court challenges only § 440.15(3)(a)1[1] and § 440.11,[2] Florida Statutes. *569 He had already been paid for medical and temporary disability benefits, and did not claim any wage loss or attack the wage loss provisions even with respect to the minimum threshold loss requirements.[3] The argument, instead, relates solely to the disparity in statutory treatment of claimants who suffer no wage loss, by classifying permanent impairment by amputation, etc., as compensable and impairment by loss of use as noncompensable.
I agree with affirmance of the order dismissing the claim only because it presented no issue which the deputy could resolve except by invalidating a statute upon grounds of facial unconstitutionality which were beyond her adjudicatory authority. The recent decisions detailing doctrines of exhaustion of statutory remedies, and primacy of district court review over collateral circuit court jurisdiction, do not in my view support disposition of the merits of appellant's constitutional issues at this point.[4] None of the prior opinions supporting initial resolution of constitutional issues here have involved a case such as that now before us, in which all issues presented at the hearing level were contingent on facial unconstitutionality of a statute, which could not be determined at that level. In that narrow situation, I would leave the constitutional issues for disposition in another context either before a trial court or by a proper predicate for original jurisdiction here.
This appeal seems to me to present the essentially absurd contention that the deputy erred (1) in dismissing a claim for permanent impairment compensation benefits under a statute which was repealed before claimant's accident occurred and (2) in further denying an alternative claim for a declaration by the deputy that a common law remedy exists. The parties and the deputy all plainly recognized that neither the existence nor degree of permanent impairment was in controversy. The claim for permanent impairment benefits, based solely on grounds of alleged facial unconstitutionality of the current statute, presented no issue which the deputy had authority to decide. I am unable to see how such a procedure can logically or legally be used to obtain initial adjudication of the constitutional issues here, although that might be done in a case where other issues were presented for resolution by the deputy and for exercise of this court's appellate jurisdiction. Even if we could overlook the form and treat the appeal as a petition to mandate the deputy's exercise of jurisdiction on the merits of the claim, appellant presents no rationale or authority to support reinstatement of the former statute. I would therefore deny that relief, even assuming that there is merit in his constitutional attack on the provision which grants permanent impairment compensation (in addition to wage loss) for loss by amputation but denies such benefits for anatomic loss of use or function of a body member, in this case a thumb.
I would also deny the alternative request for declaratory judgment as to the availability of common law remedies. Declaratory relief of that kind is not, of course, provided either by Chapter 440 or by original jurisdiction of this court in the case before us. Appellant's contention is that the Florida Constitution's access clause[5] compels nullification of § 440.11, Florida Statutes, because § 440.15(3)(a)(1) excludes his impairment from compensation while including loss of a thumb in whole or in part by amputation. That contention, however, *570 is clearly premature until such time as appellant may file an action for specific relief in a competent judicial forum.
I would accordingly affirm without determining the constitutional issues.
NOTES
[1] U.S.Const. amend. XIV § 1; Art. 1, § 2, Fla. Const.
[2] U.S. Const. amend. XIV § 1; Art. 1, § 9, Fla. Const.
[3] Art. 1, § 21, Fla. Const.
[4] Sadowski, Herzog, Butler & Gokel, The 1979 Workers' Compensation Reform: Back to Basics, 7 Fla.St.U.L.Rev. 641, 649-53 (1979); see also Abberger & Granoff, Legislative Overview: The Florida Workers' Compensation Act, 1979, 4 Nova L.J. 91, 95-98 (1980).
[5] Sadowski, et al., supra n. 4, at 681-82.
[6] Id. at 682-83.
[7] This expansion of the schedule concept "opened the floodgates of controversy and litigation," A. Larson, Larson's Workmen's Compensation Law § 57.14(d) (1981).

... "[P]artial loss of use" set the stage for the innumerable numbers games to be played by doctors, lawyers, administrators and judges, endlessly quarreling about whether the loss of use of an arm was 15 percent or 22 percent or 39 percent. The next step was to extend the schedule beyond members... . [I]t is no wonder that the problems of both disability evaluation and proof become unmanageable.
[1] PERMANENT IMPAIRMENT AND WAGE-LOSS BENEFITS. 
(a) Impairment benefits. 
1. In case of permanent impairment due to amputation, loss of 80 percent or more of vision, after correction, or serious facial or head disfigurement resulting from an injury other than an injury entitling the injured worker to permanent total disability benefits pursuant to subsection (1), there shall be paid to the injured worker the following:
a. Fifty dollars for each percent of permanent impairment of the body as a whole from 1 percent through 50 percent; and
b. One hundred dollars for each percent of permanent impairment of the body as a whole for that portion in excess of 50 percent.
[2] Exclusiveness of liability. 
(1) The liability of an employer prescribed in s. 440.10 shall be exclusive and in place of all other liability of such employer to any third party tort-feasor and to the employee, ...
[3] "Such wage-loss benefits shall be ... equal to 95 percent of the difference between 85 percent of the employee's average monthly wage and the salary, wages, and other remuneration the employee is able to earn after reaching maximum medical improvement, as compared on a monthly basis; provided that the monthly wage-loss benefits shall not exceed an amount equal to 66 2/3 percent of the employee's average monthly wage at the time of injury... ."
[4] Cases collected in Department of Professional Regulation v. Hall, et al., 398 So.2d 978 (Fla. 1st DCA 1981).
[5] Florida Constitution, Article I, Section 21.