431 So.2d 204 (1983)
Fred V. SASSO, Appellant/Cross-Appellee,
v.
RAM PROPERTY MANAGEMENT and Fireman's Fund Insurance Company, Appellees/Cross-Appellants.
No. AG-112.
District Court of Appeal of Florida, First District.
April 29, 1983.
*206 Irvin A. Meyers, Orlando, for appellant/cross-appellee.
Randy Fischer of Hass, Boehm, Brown & Rigdon, P.A., Orlando, for appellees/cross-appellants.
ERVIN, Judge.
In this workers' compensation case, Sasso appeals from an order which denied his claim for permanent disability, wage-loss benefits on the ground that at the time of the injury his age was greater than that allowable for such benefits under the provision of Section 440.15(3)(b)3.d, Florida Statutes (1979). He launches several attacks against the order, urging both constitutional and nonconstitutional issues. We affirm.
In reaching our conclusions, we are called upon to determine: (1) whether the deputy erred in failing to bar the claim on the basis of the employee's misrepresentation of his age; (2) whether an appeal from the order of a deputy commissioner may raise on appeal for the first time the issue of the facial unconstitutionality of a statute; (3) whether the statute is violative of the equal protection clause of article I, section 2 of the Florida Constitution. A thorough consideration of the constitutional issue involves also a consideration of several subsidiary questions: (a) Is state action implicated? (b) If it is, what test should be applied to determine if the statute violates one's right to equal protection of the laws? The answer to the latter question involves a consideration of whether the statute has a rational relationship to the legislative objectives involved in the statute's passage, and if so, whether old age may be considered a suspect class that is entitled to a heightened form of judicial scrutiny in measuring the validity of legislation that allegedly discriminates against such class.
In 1979, Sasso applied for a job as a landscape gardner with appellee Ram Property Management. Although 78 years of age at the time of his application, and then collecting social security benefits, he hoped to earn a suitable income and remain active in his senior years. He misrepresented his birth date as "1917" on the job application, because he believed that he would not be hired if he disclosed his real age. He was hired and suffered an injury on September 19, 1979. The employer/carrier (E/C) provided medical and temporary total disability (TTD) benefits. Upon reaching maximum medical improvement (MMI), the claimant sought permanent disability, wage-loss benefits and attorney's fees. § 440.15(3)(b); 440.34(2), Fla. Stat. (1979).

I. The Claimant's Misrepresentation Does Not Bar His Entitlement to Wage-Loss Benefits.
Pointing to the claimant's misrepresentation of his age, the E/C defended, arguing that the employer would not have hired Sasso had it known his actual age because of its fear that he might have been in poor health. The E/C relies on Martin Co. v. Carpenter, 132 So.2d 400 (Fla. 1961), in which the Florida Supreme Court held that a claimant who deliberately misrepresents his physical condition on a job application would be barred from recovering workers' compensation benefits. In the case at bar, the deputy found that the "Martin v. Carpenter defense" was inapplicable, because "age is not a physical condition as contemplated under the law as set forth in the case of Martin Co. v. Carpenter, ... ." We affirm this determination, agreeing that a proper reliance on this defense requires a causal relationship between the misrepresented physical or health-related condition, the industrial accident, and the subsequent claim for workers' compensation benefits. Martin Co., at 405, 406; see also Doric Food Co. v. Allen, 383 So.2d 316, 318 (Fla. 1st DCA 1980). Even a misrepresented physical condition on an employment application will not bar compensation, unless it is related to the injury claimed. Montgomery Ward & Co. v. Provenzano, 394 So.2d 1081, 1082 (Fla. 1st DCA 1981).
The E/C has failed to show how the claimant's age-misrepresentation related to his injury. What the employer appears to argue is that the aging process is equatable with physical impairment. We are unable to make such a determination on an individual *207 basis without a record foundation. Accordingly, we affirm this portion of the deputy's order.

II. An Appellant May First Raise the Question of a Statute's Constitutionality Before An Appellate Court.
The deputy commissioner denied the claim for permanent disability wage-loss benefits based on the so-called "age/wage-loss provision," Section 440.15(3)(b)3.d, Florida Statutes (1979), which states that "[t]he right to [permanent disability] wage-loss benefits shall terminate: ... d. When the injured employee reaches age 65... ." On appeal the claimant argues that the foregoing violates his United States and Florida Constitutional right to due process,[1] equal protection,[2] his Florida Constitutional right of access to courts,[3] and the federal Age Discrimination in Employment Act (ADEA).[4]
The record discloses that the parties did not raise or attempt to litigate the issue of the constitutionality of the age/wage-loss provision either before or during the hearing or during the period before the deputy commissioner's appealable order became final, as required by Section 440.25(4)(a), Florida Statutes. The E/C argues that this is fatal to the claimant's appeal, since the issue has not been properly preserved for appellate review. See Sunland Hospital/State of Florida v. Garrett, 415 So.2d 783 (Fla. 1st DCA 1982). We disagree. The issue raised on appeal involves the facial constitutionality of the statute, and such an issue is not cognizable by a deputy commissioner. Accordingly, it would have been futile to raise the issue below. Therefore, we recognize a very narrow exception to the rule stated in Sunland Hospital, requiring preservation of an issue for appellate review. The fact that the issue raised on appeal is strictly constitutional in nature and the statute's application formed the basis for the deputy's denial of permanent disability wage-loss benefits is sufficient to permit appellate review.
Next, the E/C contends that because the question of the facial unconstitutionality of a section of the workers' compensation law may not be adjudicated by a deputy commissioner, the case is not ripe for appellate review and must first be presented in a trial court. See Carr v. Central Florida Aluminum Products, Inc., 402 So.2d 565 (Fla. 1st DCA 1981). The claimant counters by asserting that this court has reviewed numerous claims that the new Workers' Compensation Act is unconstitutional, all of which have been appealed from determinations by a deputy commissioner. See, e.g., Carr; Johnson v. R.H. Donnelly Co., 402 So.2d 518 (Fla. 1st DCA 1981).[5]
Deputy commissioners do not have the power to render a determination as to the constitutionality of a portion of the Workers' Compensation Act, because a hearing before a deputy commissioner is part of an administrative remedy. Cf. Rollins v. Southern Bell Telephone & Telegraph Co., 384 So.2d 650, 652-653 (Fla. 1980). "[D]eputy commissioners function only as adjudicative officers in a traditional sense... ." Ortega v. Owens-Corning Fiberglas Corp., 409 So.2d 530, 532 (Fla. 1st DCA 1982). As the Florida Supreme Court *208 recognized quite recently, a deputy is vested only with certain limited quasi-judicial powers. Smith v. Piezo Technology, 427 So.2d 182 (Fla. 1983). As administrative officers, deputy commissioners lack jurisdiction to consider claims of the facial unconstitutionality of any section of the Workers' Compensation Act. Cf., Key Haven Associated Enterprises, Inc. v. Board of Trustees, 427 So.2d 153, 157 (Fla. 1982). However, this court does have jurisdiction to consider such claims and is, effectively, the most suitable court to which a claim of statutory unconstitutionality can be made.
In a case, such as the situation at bar, the constitutional issue is not independent of the deputy commissioner's determinations. It "is inseparable from it, and the constitutional question is necessarily phrased, ingeniously or ingenuously, as a variation of" claimant's request for benefits, which is nonconstitutional in nature. Key Haven Associated Enterprises, Inc. v. Board of Trustees, 400 So.2d 66, 71 (Fla. 1st DCA 1981), aff'd in part and rev'd in part, 427 So.2d 153 (Fla. 1982). The only impediment to disposition of an issue relating to the facial unconstitutionality of a section of the Workers' Compensation Act is that it must be shown that the issue is actually ripe for adjudication. As noted in Ortega, at 532, the Workers' Compensation Act, Chapter 440, does not offer this court the same fact-finding resources available in cases of administrative appeals under Chapter 120, Florida Statutes. Therefore, an insufficiently developed record might negate the possibility of appellate review. For example, the record should clearly indicate the appellant's standing to raise the issue of the facial unconstitutionality of a specific section of the law.
As a general rule, no one can urge the unconstitutionality of a workmen's compensation act who is not injuriously affected by the feature complained of. Thus, a constitutional question may not be raised by one benefited, rather than injured, by the operation of the provision attacked, or against whom no attempt is made to enforce the challenged provision, or by an employee having no right of recovery except under the assailed compensation act; and neither the employer nor the employee will be heard to urge the grievance of the other. On the other hand, one whose rights are adversely affected by the operation of a compensation act may assert its invalidity.
16 C.J.S. Constitutional Law § 76 at 243-244 (1956) (footnote cites omitted); see also Rhaney v. Dobbs House, Inc., 415 So.2d 1277, 1279 (Fla. 1st DCA 1982).
The requirement of standing has been strictly enforced by this court in other cases assaulting the wage-loss statute, section 440.15(3)(a) and (b), as unconstitutional. See Acosta v. Kraco, Inc., 426 So.2d 1120 (Fla. 1st DCA 1983); Acton v. Ft. Lauderdale Hospital, 418 So.2d 1099 (Fla. 1st DCA 1982); Robbins v. Rophie Shoes, Inc., 413 So.2d 839 (Fla. 1st DCA 1982); and Jack Eckerd Corp. v. Coker, 411 So.2d 1026 (Fla. 1st DCA 1982). Acosta, for example, is clearly distinguishable from the case sub judice in that in Acosta the deputy made no determination  as here  that claimant would be entitled to wage-loss benefits if he had not already reached age 65 at the time of injury. Indeed, the deputy below specifically found that the claimant should recover such benefits were it not for the provisions of Section 440.15(3)(b)3.d.
To determine whether the claimant before us has standing to attack the constitutional validity of the age/wage-loss law, we look first to the statute to determine the affected class, and then to the record to ascertain whether the appellant falls within the affected class. Because the claimant is at least 65 years of age, collects social security benefits, and is apparently otherwise eligible for wage-loss benefits, the record in this case clearly reveals that he is a member of that class,[6] thereby distinguishing this *209 case from Acton, Robbins, and Jack Eckerd Corp. Further, the issue is sufficiently defined to permit appellate review of the constitutional issue.

III. The Statute Does Not Deny an Aged Claimant's Right to Access to Courts.
Claimant contends that section 440.15(3)(b)3.d. violates the access to courts' provision of Florida's constitutional Declaration of Rights which provides, "The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Art. I, § 21, Fla. Const. Kluger v. White, 281 So.2d 1 (Fla. 1973), formulated the test to be applied in determining whether a statute is violative of this provision:
[W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.

281 So.2d at 4 (emphasis supplied). More precisely, the legislature may abolish such a right in two instances: (1) where it authorizes a reasonable alternative for the redress of injuries, or, (2) where it can demonstrate an overpowering public necessity for abolishing such a right. As an example of the first situation, the court cited Florida's Worker's Compensation Act which had
abolished the right to sue one's employer in tort for a job-related injury, but provided adequate, sufficient, and even preferable safeguards for an employee who is injured on the job, thus satisfying one of the exceptions to the rule against abolition of the right to redress for an injury.

Id. (emphasis supplied) The second situation is exemplified by statutes abolishing the common law action for alienation of affections as an attempt to prevent the danger of blackmail and extortion. See Rotwein v. Gersten, 160 Fla. 736, 36 So.2d 419 (1948). In addition to defining two situations in which a right of action may be completely abolished, the court has recognized that the doctrine precluding access to courts does not apply to statutes that limit the right of action to some extent and do not completely bar redress in a judicial forum. See McMillan v. Nelson, 149 Fla. 334, 5 So.2d 867 (1942). As a result, subsequent Florida Supreme Court cases have declined to hold statutes unconstitutional where rights of action have not been completely abolished. See Pinillos v. Cedars of Lebanon Hospital Corporation, 403 So.2d 365 (Fla. 1981) (admissibility of collateral source evidence in medical malpractice actions upheld); Purdy v. Gulf Breeze Enterprises, Inc., 403 So.2d 1325 (Fla. 1981) (statute requiring reimbursement of insurer for PIP benefits, where insured recovers from negligent third party, does not deny access to courts); Chapman v. Dillon, 415 So.2d 12 (Fla. 1982) (threshold limits of no-fault statute provide a reasonable alternative to tort action and do not deny access to courts).
This court, recognizing that legislative enactments are presumed constitutional, Jetton v. Jacksonville Electric Authority, 399 So.2d 396, 398 (Fla. 1st DCA 1981), has been equally reticent in declaring statutory provisions unconstitutional on the basis of Kluger. In upholding the validity of statutory *210 limits on damages recoverable in actions against governmental units, we placed a narrow interpretation on the Kluger rule, stating:
In Kluger, the Supreme Court held only that the complete abolition of a prior common law right to recover for automobile accident property damages violates the right to redress provision, absent either a substitute remedy "to protect the rights of the people of the State to redress for injuries" or a legislative demonstration of "overpowering public necessity." 281 So.2d at 4.
Guided by case law subsequent to Kluger, we narrowly construe the instances in which constitutional violations will arise. The Constitution does not require a substitute remedy unless legislative action has abolished or totally eliminated a previously recognized cause of action.
As discussed in Kluger and borne out in later decisions, no substitute remedy need be supplied by legislation which reduces but does not destroy a cause of action. The Court pointed out that legislative changes in the standard of care required, making recovery for negligence more difficult, impede but do not bar recovery, and so are not constitutionally suspect. Kluger, 281 So.2d at 4, discussing McMillan v. Nelson, 149 Fla. 334, 5 So.2d 867 (Fla. 1942) (automobile guest statute). Accord, Abdin v. Fischer, 374 So.2d 1379 (Fla. 1979) (limiting liability of owners of public recreational areas). Similarly, shortening the period in which a litigant may sue, as opposed to barring his cause of action entirely, does not trigger the substitute remedy requirement. Nor does elimination of one possible ground for relief require the legislature to provide some replacement.
399 So.2d at 398 (footnotes omitted). See also Alterman Transport Lines, Inc. v. State, 405 So.2d 456 (Fla. 1st DCA 1981) (no reasonable alternative need be provided where legislation only reduces, but does not destroy, a cause of action).
Similar results have been reached in cases addressing constitutional challenges to the worker's compensation law which, as recognized by Kluger, provides in general a reasonable alternative to common law tort actions. Specific sections of Chapter 440, most notably section 440.11, which provides for exclusivity of remedy, have also withstood access to court challenges. See Chittick v. Eastern Airlines, Inc., 403 So.2d 595 (Fla. 1st DCA 1981); Favre v. Capeletti Brothers, Inc., 381 So.2d 1356 (Fla. 1980); Seaboard Coast Line Railroad Co. v. Smith, 359 So.2d 427 (Fla. 1978); Carroll v. Zurich Insurance Company, 286 So.2d 21 (Fla. 1st DCA 1973); Carter v. Sims Crane Service, Inc., 198 So.2d 25 (Fla. 1967). In at least two cases, the exception to the Kluger rule has been applied to workers' compensation statutes. Thus, in Iglesia v. Floran, 394 So.2d 994 (Fla. 1981), the constitutionality of section 440.11, relating to actions of claimants against negligent co-employees, was upheld because the court found that the statute merely modified the degree of negligence required, rather than abolishing the right of action. Similarly, this court has applied the exception to section 440.20(12)(a), which prohibits the release of the employer/carriers' liability for future medical expenses, and has concluded that that section is constitutional in that it merely limits a right of action rather than abolishing it. Johnson v. R.H. Donnelly Co., 402 So.2d 518, 520 (Fla. 1st DCA 1981).
As it has been generally recognized that chapter 440 provides a reasonable alternative to common law tort actions and so is not violative of the access to the courts provision, the question of the constitutionality of section 440.15(3)(b)3.d. depends on whether it comes within the exception to the Kluger rule, i.e., whether that section merely limits a claimant's right to wage-loss benefits rather than completely abolishes it. We find that the statute falls within the former category. Section 440.15(3) does not bar a claimant who is either permanently, totally disabled or temporarily, totally impaired from such benefits. Nor does it bar one who is permanently, partially impaired from remedial medical treatment, as authorized under section 440.13(1), Florida Statutes. Section 440.15(3)(b)3 *211 does, however, conditionally affect the right of an injured worker, who retains the capacity to earn wages, from receiving wage-loss benefits, by terminating such benefits upon the occurrence of any one of the following events:
a. As of the end of any 2-year period commencing at any time subsequent to the month when the injured employee reaches the date of maximum medical improvement, unless during such 2-year period wage-loss benefits shall have been payable during at least 3 consecutive months;
b. For injuries occurring on or before July 1, 1980, 350 weeks after the injured employee reaches the date of maximum medical improvement;
c. For injuries occurring after July 1, 1980, 525 weeks after the injured employee reaches maximum medical improvement; or
d. When the injured employee reaches age 65, ....
The statute, thus, limits a claimant's entitlement to wage-loss benefits upon the occurrence of any one of the four conditions, while not affecting, in any way, his right to any of the other compensation benefits provided by chapter 440. As such, this section falls within the exception to the Kluger rule and does not violate Florida's access to courts provision.

IV. The Statute Does Not Conflict With the Equal Protection Clauses of Either the Florida or Federal Constitutions.

A. State Action is Implicated.
The first step in our analysis is to determine whether the alleged equal protection violation stems from "state action." Id. at 715-717; see generally Developments in The Law  Equal Protection, 82 Harv.L. Rev. 1065, 1069-1072 (1969); 16A Am.Jur.2d Constitutional Law §§ 742-743 (1979). In answering this question, we use federal authority as a guide because of the parallel commands of the federal and Florida constitutions. As noted by this court in Schreiner v. McKenzie Tank Lines & Risk Management Services, Inc., 408 So.2d 711 (Fla. 1st DCA 1982), approved, 432 So.2d 567 (Fla. 1983), the Florida's Constitution's equal protection clause was intended by the framers and adopters of our state constitution to function in a manner similar to that embraced by the Fourteenth Amendment.
To ascertain the existence of state action, one should be able to answer affirmatively the question: "[I]s the alleged infringement of federal [or Florida constitutional] rights `fairly attributable to the state?'" Rendell-Baker v. Kohn, ___ U.S. ___, ___, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418, 426 (1982); see also Lugar v. Edmondson Oil Co., ___ U.S. ___, ___, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482, 495 (1982).
The foregoing question is easily answered in the affirmative. We are asked to give effect to a discriminating statute effectuated by the state which denies workers' compensation benefits for permanent disability, if the individual is sixty-five years of age or older. Cases involving judicial enforcement of a discriminating legislative enactment so clearly involve state action that the courts routinely ignore analysis of the existence of state action. Parks v. "Mr. Ford", 556 F.2d 132, 135-136 n. 6a (3d Cir.1977). That state action exists in instances involving effectuation of state workers' compensation laws is implicitly supported by United States Supreme Court decisions finding statutory provisions denying certain benefits to be violative of equal protection of the law. See Wengler v. Druggists Mutual Insurance Co., 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980) (state workers' compensation statute violated equal protection by denying widower benefits as a result of wife's workrelated death); Weber v. Aetna Casualty and Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (state workmen's compensation statute violated equal protection by denying death benefits to decedent's illegitimate child).

B. Application of the Three Generally Recognized Tests to Determine Whether the Statute Violates Florida's Equal Protection Clause.
Because there is discriminating state action in the case at bar, we are required *212 next to determine whether the course of action chosen by the state fails to pass constitutional muster. The answer to this question requires that the challenged action be scrutinized by several generally identifiable tests. They include: (1) the rational basis test; (2) the substantial relationship test, an intermediate form of judicial scrutiny, and (3) strict judicial scrutiny. As to the latter test, strict scrutiny, we need mention only briefly its inapplicability to the case at bar: "The law is now clear that a restriction on individual rights on the basis of age need not pass the `strict scrutiny' test, ... ." White Egret Condominium, Inc. v. Franklin, 379 So.2d 346, 351 (Fla. 1979). Our attention, then, is focused upon the former two analyses. And, in our attempt to find a solution, we are once again guided by federal precedent "relevant and persuasive to the consideration of whether Florida's equal protection clause has been violated." Osterndorf v. Turner, 426 So.2d 539, 543 (Fla. 1982). Indeed, the application of this method of testing discriminatory state action to determine if it violates the Florida equal protection clause meshes with the intent of the framers and adopters of our state constitution, because they intended that the Florida equal protection clause operate in a manner similar to the fourteenth amendment. Schreiner, 408 So.2d at 716.

1. The Rational Basis Test.
Before determining whether the legislative objective in the case at bar survives the rational basis test, we must first decide the standard by which the test should be applied. Normally, this would be a simple matter of examining the latest United States or Florida Supreme Court decisions, but the historical development of this test has followed a somewhat troubling, if not inconsistent course, resulting in no little confusion as to its application.
Nearly one hundred years ago, the United States Supreme Court observed that class-based distinctions "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." Gulf, C. & S.F.R. Co. v. Ellis, 165 U.S. 150, 155, 17 S.Ct. 255, 257, 41 L.Ed. 666 (1897) (e.s.). The "reasonable and just relation" standard evolved two years later into a standard requiring that the class must bear at least "some reasonable basis." Atchison, T. & S.F.R. Co. v. Matthews, 174 U.S. 96, 105, 19 S.Ct. 609, 613, 43 L.Ed. 909 (1899). The Court framed the test by asking, "Is the classification or discrimination prescribed thereby purely arbitrary or has it some basis in that which has a reasonable relation to the object sought to be accomplished?" Id. (e.s.). The "some reasonable basis" standard was reasserted twelve years later as the proper standard comprising the rational basis test in Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).
The confusion in defining the composition of the rational basis test arose a few years later in Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). The Court seemed to abandon its standard requiring that a classification bear "some reasonable basis," requiring instead that "the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, ... ." Id. 253 U.S. at 415, 40 S.Ct. at 561-62 (emphasis supplied). The "substantial relationship" standard seemed to take firm hold in 1930 when the court referred to this standard in conjunction with the term "rational basis." See Ohio Oil Co. v. Conway, 281 U.S. 146, 160, 50 S.Ct. 310, 314, 74 L.Ed. 775 (1930).
However, throughout the years between 1930 and 1960, the Court alternatively applied the "some reasonable basis" standard,[7] and the "substantial relationship" standard.[8] *213 Doubt as to which standard comprised the rational basis test was settled to some extent by the adoption of the "some reasonable basis" standard in McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The wording of the McGowan opinion seems to have accorded an enhanced level of deference to state action by its observations that equal protection "is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective," and that a state's discriminatory actions "will not be set aside if any state of facts reasonably may be conceived to justify it." Id. 366 U.S. at 425, 426, 81 S.Ct. at 1105.
The "some reasonable basis" standard became well entrenched during the 1960's, although near the end of the decade the Court seemed to back away slightly from the extremely deferential language in McGowan. For example, in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161-62, 25 L.Ed.2d 491 (1970), the Court returned to the more traditional language of the early cases such as in Atchison, T. & S.F.R. Co. v. Matthews and Natural Carbonic Gas Co., commenting that in areas of economic and social welfare, classificatory schemes bearing "some reasonable basis" to a legitimate state objective would satisfy the rational basis test.
Just when the "substantial relationship" standard, originally advocated in Royster Guano Co., seemed no longer existent, the Court again relied on it in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The opinion declared unconstitutional an Idaho probate statute giving preference to men over women for appointment as administrators of a decedent's estate, because the statute did not have a "fair and substantial relation to the object of the legislation, ... ." Id. 404 U.S. at 76, 92 S.Ct. at 254. Infused with new life, the Royster Guano "substantial relationship" standard was thus resurrected, free to create new confusion over whether the "some reasonable basis" standard or the less deferential "substantial relationship" standard represented the rational basis test. As we will see, infra, the more recent opinions of the United States Supreme Court have abandoned this standard within the context of rational basis, but it has now merged as a separate test for gauging the constitutionality of legislation creating "discrete and insular" groups (quasi/suspect classes).
This confusion has worked its way into Florida law during the ten years or so following the Reed decision.[9] In Lasky v. State Farm Insurance Co., 296 So.2d 9, 17-18 (Fla. 1974), the Florida Supreme Court was called upon to determine the constitutionality of a portion of the so-called No-Fault Automobile Insurance Law. Finding no denial of equal protection under either the federal or state constitutions, the court applied the "substantial relationship" standard.[10] A few years later in Gammon v. Cobb, 335 So.2d 261, 264 (Fla. 1976), the court applied the "just and reasonable relation" language first announced in Gulf, C. & S.F.R. Co., 165 U.S. at 155, 17 S.Ct. at 257. See also McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).
Whether or not the "just and reasonable relationship" language should be equated with the "some reasonable basis" or "substantial relationship" standard of Royster Guano Co. under the U.S. or Florida Constitutions is not altogether clear to us. However, in Rollins v. State, 354 So.2d 61 (Fla. 1978), the "just and reasonable relation" language was again applied to declare a statute regulating the age of persons visiting billiard parlors unconstitutional under *214 both the Florida and U.S. equal protection clauses. As authority for application of the "just and reasonable relation" language, Royster Guano was cited, thereby suggesting that the "just and reasonable relation" terminology was equatable to the "substantial relationship" standard. Id. at 63. This view was reinforced in State v. Lee, 356 So.2d 276 (Fla. 1978), wherein a violation of both the fourteenth amendment and article I, section 2 of the Florida Constitution was found to exist. Although no suspect or quasi-suspect class was involved, the "substantial relation" standard was applied. The "just and reasonable relation" language was also specifically equated to the "substantial relation" standard. Id. at 279. Finally, in State v. Leicht, 402 So.2d 1153, 1154 (Fla. 1981), the court upheld a drug trafficking law, specifying that it satisfied the rational basis test. In defining the applicable standard for that test, the court referred to a requirement of a "reasonable and just relationship." Id. at 1155.[11] Thus, it appears that the requirement of a "just and reasonable relationship" of a classificatory scheme to a legislative objective in Florida is another way of saying that a "substantial relationship" is required to satisfy the rational basis test.
A number of other cases have applied the "substantial relationship" standard to situations involving non-suspect or non-quasi suspect classifications, apparently under both the U.S. and Florida equal protection clauses. See, e.g., Chapman v. Dillon, 415 So.2d at 18 (involving U.S. constitutional principles of equal protection and relying on Lasky); Department of Revenue v. Amrep Corp., 358 So.2d 1343, 1349 (Fla. 1978) (involving fourteenth amendment); Carr, 402 So.2d at 567 (involving fourteenth amendment and relying on Lasky); and Hegeman-Harris Co., Inc. v. All State Pipe Supply Co., 400 So.2d 1245, 1246 (Fla. 5th DCA 1981) (Cowart, J., dissenting) (applying federal and state equal protection clauses).
Unfortunately, however, our quest for the appropriate standard was thwarted by what appears to be a mid-course correction of our supreme court. The court's more recent decisions have applied the rational basis test under either of the two clauses and have elected to define that test on the "some reasonable basis" standard. See, e.g., Ostendorf, 426 So.2d at 546 (Alderman, C.J., dissenting) (applying Florida equal protection clause); Pinillos v. Cedars of Lebanon Hospital Corp., (applying federal and Florida constitutional provisions); Gluesenkamp v. State, 391 So.2d 192, 200 (Fla. 1980) (applying federal and Florida provisions); In re Estate of Greenberg, 390 So.2d 40, 42 & 46 (Fla. 1980) (involving only fourteenth amendment); cf. Haber v. State, 396 So.2d 707, 708 (Fla. 1981); contra Chapman v. Dillon.
The disparity between the "substantial relationship" and "some reasonable basis" standards is perhaps best typified by Pinillos, wherein the majority equated the "reasonable relationship" standard to the rational basis test. The majority's view may be contrasted with the carefully drawn dissent of then Chief Justice Sundberg in which he suggested that the statute should be tested under the "fair and substantial relation" standard. Pinillos, at 370. Contrasting this standard with the "bare rational relationship" test, he referred to the substantial relationship standard alternatively as a "slightly higher standard for equal protection review" and as an "elevated standard." Id.[12] Chief Justice Sundberg's authority for application of this standard was the 1971 United States Supreme Court decision in Reed v. Reed.
Thus, our analysis of the alternative "some reasonable relation" and "substantial relationship" standards for the rational basis test under both pre-1970 United States *215 Supreme Court and more recent Florida Supreme Court decisions has come full circle. Given the fact that both this court[13] and the Florida Supreme Court[14] have stated that the federal definition of the rational basis test should prevail under Florida's equal protection clause, we are left to ponder: (1) whether Reed v. Reed's reliance on the Royster Guano "substantial relationship" standard was intended by the Court to be the rational basis test; (2) the continuing efficacy of the Royster Guano "substantial relationship" standard, and (3) the current United States Supreme Court stance regarding the rational basis test.
Our research suggests that Reed v. Reed does not represent an adoption of the "substantial relationship" standard for rational basis purposes. As Professor Laurence H. Tribe has noted, "It is difficult to understand [the Reed] result without an assumption that some special sensitivity to sex as a classifying factor entered into the analysis... . Only by importing some special suspicion of sex-related means ... can the result be made entirely persuasive." Tribe, American Constitutional Law § 16-25 n. 4 (1978) [hereinafter: Tribe], citing Gunther, The Supreme Court, 1971 Term: Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 34 (1972). Today, of course, sex is viewed as a quasi-suspect class. See Mississippi University for Women v. Hogan, ___ U.S. ___, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). Consequently, the commentators view Reed as the seed from which an intermediate form of equal protection scrutiny for quasi-suspect classes has evolved. See, e.g., Tribe, supra at § 16-25. This test is discussed in greater detail infra.
Although the "substantial relationship" standard, employed in Reed, may now be applicable to cases involving a quasi-suspect class, this is not determinative as to the continuing efficacy of the standard as originally set forth in Royster Guano Co., because that case has never been overruled. However, two recent cases cast doubt on the continuing vitality of the Royster Guano "substantial relationship" standard. In United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 175, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980), the Supreme Court approved the following quote from Dandridge v. Williams, 397 U.S. at 485-86, 90 S.Ct. at 1161-62, as being the proper standard for rational basis review:
"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some `reasonable basis,' it does not offend the Constitution simply because the classification `is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369]. `The problems of government are practical ones and may justify, if they do not require, rough accommodations  illogical, it may be, and unscientific.' Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 68-70 [33 S.Ct. 441, 443, 57 L.Ed. 730]... .
... "[The rational-basis standard] is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy."
(emphasis supplied).
The Court's opinion further observes "that where social or economic regulations are involved Dandridge v. Williams, ... state[s] the proper application of the [rational basis] test." Fritz, 449 U.S. at 176-177 n. 10, 101 S.Ct. at 460 n. 10. Thus, Fritz clearly abandons the Royster Guano Co. "substantial relationship" standard. Cf. Leedes, The Rationality Requirement of the Equal Protection Clause, 42 Ohio St.L.J. 639, 655 (1981). The Court now opts for the "some reasonable basis" standard used in Dandridge, which has its roots in the early cases of Atchison, T. & S.F.R. Co. v. Matthews and Natural Carbonic Gas Co.
*216 More recently, in City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 292-294, 102 S.Ct. 1070, 1076-77, 71 L.Ed.2d 152, 162-63 (1982), the Court reviewed a U.S. Fifth Circuit Court of Appeals decision involving a city ordinance in Mesquite, Texas. The Fifth Circuit opinion referred to the "fair and substantial relationship" standard under a part of the opinion entitled "Rational Basis." The Supreme Court first inferred that this standard must be a higher form of scrutiny under the Texas Constitution. Id. 455 U.S. at 294 n. 17, 102 S.Ct. at 1077 n. 17, 71 L.Ed.2d at 162-63 n. 17. The Court cast further doubt on the continuing vitality of the Royster Guano standard, observing somewhat cryptically that "it is unclear whether this Court would apply the Royster Guano standard to the present case. See United States Railroad Retirement Bd. v. Fritz, ... [further cites omitted]. Therefore, it is surely not evident that the Texas [equal protection] standard and the federal standard are congruent." City of Mesquite, 455 U.S. at 294, 102 S.Ct. at 1077, 71 L.Ed.2d at 163.
Thus, to summarize, we conclude that for purposes of minimal scrutiny under the federal equal protection clause, the "some reasonable basis" standard as set forth in Dandridge is the appropriate standard when employing the rational basis test. See Fritz, 449 U.S. at 176-177 n. 10, 101 S.Ct. at 460 n. 10. Second, the "substantial relationship" standard, as delineated in Royster Guano, while not explicitly overruled for rational basis purposes, seems to be more properly employed in cases involving an intermediate, heightened form of judicial scrutiny. Given the parallel operation of the fourteenth amendment and article I, section 2 of the Florida Constitution, it would seem that the continuing efficacy of the "substantial relationship" standard in the rational basis setting has been cast in serious doubt. Finally, because the "just and reasonable relation" terminology in Florida has been equated with the "substantial relationship" standard, its fate seems to be tied to that of the "substantial relationship" standard.
Accordingly, the "some reasonable basis" standard, as originally set forth in Dandridge and cited in Fritz, now appears to be the proper form of the rational basis test under the Florida Constitution. This view squares with many of the most recent Florida Supreme Court opinions in which Dandridge has been cited as employing the proper rational basis test. See, e.g., Ostendorf, 426 So.2d at 546 (Alderman, C.J., dissenting); Gluesenkamp, 391 So.2d at 200; In re Estate of Greenberg, 390 So.2d at 42, 46; see also Pinillos, 403 So.2d at 367 (relying on the Dandridge test cited in Greenberg). Although the composition of the rational basis test has had a checkered application, neither state nor intermediate federal appellate courts can be faulted for participating in its somewhat erratic course, given the fact that even the United States Supreme Court readily admits to the lack of "a uniform or consistent test under equal protection principles." See Fritz, 449 U.S. at 176-177 n. 10, 101 S.Ct. at 460 n. 10.
We now turn to the proper method of employing the rational basis test by use of the "some reasonable basis" standard. Generally, as long as the classificatory scheme chosen by the legislature rationally advances a legitimate governmental objective, courts will disregard the methods used in achieving the objective, and the challenged enactment will be upheld. Schweiker v. Wilson, 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981). The test, like that used in McGowan v. Maryland, is still highly deferential toward actions taken by the state  perhaps unduly so.[15] It is *217 moreover virtually insurmountable, because the burden of showing that the state action is without any rational basis is placed on the individual assailing the classificatory scheme. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
In attempting to meet his burden, the claimant in the case at bar asserts that there is no legitimate state purpose furthered by the age/wage-loss provision. We disagree. In determining what the purpose or objective of a statute is, we are guided by Schweiker v. Wilson, wherein the Court commented that the objective to be tested under the rational basis test must be specifically identified. 450 U.S. at 235, 101 S.Ct. at 1083. There are three primary means by which the governmental objective may be identified: (1) reliance on statements of intent from legislative reports and journals; (2) inferences of an objective by reference to similar legislation or actions taken by the legislative body, or (3) gleaning the purpose from the legal arguments of the government before the court.[16]Id. 450 U.S. at 235-37, 101 S.Ct. at 1083-84; cf. Ostendorf, 426 So.2d at 542, 545 (post-legislative statements of statutory purpose considered).
Although we are unable to decide what the legislatively intended objective of the age/wage-loss provision is from a review of legislative documents, the E/C argues that the objective of the statute is to halt the practice of "double-dipping" that would occur if an individual aged sixty-five or over were permitted to collect both workers' compensation and social security benefits. The E/C suggests that a result that would allow him to collect both benefits would be contradictory since it would authorize an injured worker to obtain compensation on one hand, while at the same time it would permit him to receive social security benefits as a retired worker.
That the legislature did not intend for the worker to reap a windfall by a duplication of such benefits, the E/C refers to a modification of the age/wage-loss provision that occurred at the legislative session following the session at which the provision was originally enacted. In 1980, the legislature amended the statute by providing that an injured worker's right to permanent disability wage-loss benefits terminates "[w]hen the injured employee reaches age 65 and becomes eligible for benefits under 42 U.S.C. ss. 402 and 405, ... ." Chap. 80-236, § 5, Laws of Fla. (added language emphasized) The added language requires that an injured worker's wage-loss benefits may not be terminated unless he is both sixty-five or older and receiving old age and survivors insurance benefits (O.A.S.I.), more commonly referred to as social security retirement benefits. "[T]he timing and circumstances of an enactment may indicate it was formal only and served as a legislative clarification or interpretation of existing law, and thus such an enactment may even *218 suggest that the same rights existed before it." Williams v. Hartford Accident & Indemnity Co., 382 So.2d 1216, 1220 (Fla. 1980); Speights v. State, 414 So.2d 574, 577 (Fla. 1st DCA 1982). Because the amendatory language in the age/wage-loss provision was relatively minor, was added to an act that was the first of its type in the nation and experimental in nature, and was added at the legislative session immediately following the original enactment of the wage-loss law, we are convinced that the 1980 amendment was merely a clarification of what was intended by the 1979 version of the age/wage-loss provision.[17] Consequently, we view the 1979 version of the age/wage-loss law as affecting only those who are at least sixty-five and collecting O.A.S.I. We also agree with the E/C that the 1980 clarifying language does provide a guide from which we may infer the objective of the provision.
To determine, then, whether the statute survives the rational basis test, we first resolve, as recommended in Schweiker v. Wilson, whether it meets some of the objectives sought by the legislature in its passage. We can envision at least four possible objectives inherent in the statute: First, to halt the practice of double-dipping; second, to cut the payment of employment-related fringe benefits due to an old age-related decline in productivity and physical abilities, third, to make room in the job market for younger workers by inducing retirement of older workers through a process of wage or fringe benefit reduction, and fourth, to reduce the costs of insurance premiums to the employers.
Turning to the first objective  that of halting the practice of double-dipping  we find that it is a legitimate legislative objective. Brown v. Goodyear Tire & Rubber Co., 3 Kan. App. 2d 648, 599 P.2d 1031, 1036 (1979), aff'd, 227 Kan. 645, 608 P.2d 1356 (1980), appeal dismissed sub nom., Brown v. Kansas Workmen's Compensation Fund, 449 U.S. 914, 101 S.Ct. 310, 66 L.Ed.2d 142, reh. denied, 449 U.S. 1068, 101 S.Ct. 799, 66 L.Ed.2d 614 (1980).[18] However, the statutory scheme cannot possibly be rationally related to this goal. Two forms of benefits are involved  social security retirement benefits and workers' compensation disability benefits. "Neither has any relationship with the other; one is a state program, one is a federal program. Workmen's compensation is based upon a contractual arrangement; these social security benefits derive from old age retirement insurance." Brown, 608 P.2d at 1358 (Herd, J., dissenting).[19] Admittedly, O.A.S.I. social security benefits, workers' compensation, and unemployment compensation are to some extent all part of the same system, a system geared toward compensation for wage loss, 4 Larson, The Law of *219 Workmen's Compensation, §§ 97.00, 97.10 (1983), and "the cause of the wage loss merely dictates the category of legislation applicable." Id. at § 97.10.
The common goal of all three compensating benefits does not necessarily support the E/C's thesis that O.A.S.I. benefits are primarily for the decent support of elderly workmen who have ceased to labor,[20] and are intended to insure that persons removed from the active labor market because of advanced age will enjoy comfortable retirement years predicated upon a modest, but adequate, income earned during their active employment years.[21] A worker, however, aged 70 or older may still be fully employed and earn the full amount of O.A.S.I. benefits to which he would otherwise be entitled, if he were fully retired. See 42 U.S.C.A. § 403(f)(3) (Supp. 1982).[22] Thus, it appears to us that O.A.S.I. benefits, although intended to assist a worker in his retirement, have evolved into a benefit that is more attributable to advanced years rather than to retirement or wage-loss. We therefore fail to see how wage-loss disability benefits and O.A.S.I. benefits can be considered duplicative. The lack of any commonality of purpose saps the statute of rationality, assuming its purpose is the avoidance of double-dipping. Accord, Cruz v. Chevrolet Grey Iron, Division of General Motors Corp., 398 Mich. 117, 247 N.W.2d 764, 782-783 (1976) (Williams, J., dissenting).
Turning to the next objective implied in the statute's enactment  to reduce payments of employment-related fringe benefits owing to a decline in the older worker's productivity and physical abilities  we find that a similar question confronted the Michigan Supreme Court in Cruz. The statute under scrutiny there required a reduction in workers' compensation benefits from 5% to 50%, commencing at age 65. The Cruz majority recognized that a statute reducing workers' compensation benefits for individuals aged 65 or older could have been enacted in recognition of the worker's diminished productivity and physical abilities. While old age and a corresponding decrease in productivity have a tenuous relationship,[23] there is at least some relationship. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 315, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). That the legislature has formed the class of old age by fixing the line of demarcation at age 65 is not fatal, because equal protection principles do not require that the classification be drawn with precision or "mathematical nicety." Dandridge, 397 U.S. at 485-86, 81 S.Ct. at 1161.
A legislatively designated age does not, in Professor Michael Perry's opinion, necessarily offend the rational basis standard of review.[24] Perry, The Principle of Equal Protection, 32 Hastings L.J. 1133, 1150 (1981) [hereinafter: Perry]. Thus, under his analysis, age may constitute an appropriate proxy for physical capacity. The alternative *220 to general proxy determinations would be to require reliance on individual determinations of physical ability  an alternative that is lacking in practicality since it would be difficult, if not impossible, for medical science to predict with accuracy when an older person would no longer have the physical capacity to perform a physically demanding stressful job. Perry, supra, at 1150. Moreover, individual determinations of fitness are irrelevant, because what is at issue is relative fitness. The question is not whether a specific older person meets fitness requirements, but whether younger persons are generally more fit. Id.
A third possible objective inheres in the statute as an attempt to offer increased job opportunities to young workers entering the labor force by creating incentives to older workers to retire by providing them decreased disability coverage.[25] "Whether in fact the Act will promote" its goal "is not the question: the Equal Protection Clause is satisfied by our conclusion that the ... Legislature could rationally have decided that" the age/wage-loss provision might assist in fostering greater job opportunities by creating an incentive to retire through decreased disability coverage. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981) (emphasis supplied).
As Perry points out, age itself may be used as a legitimate determinant of one's moral status when testing the constitutionality of legislation that has as one of its goals the opening of employment opportunities for a younger work force. Perry, supra at 1154-55. Such statutes have uniformly been upheld. See Palmer v. Ticcione, 576 F.2d 459, 462 (2d Cir.1978), cert. denied, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979); Lamb v. Scripps College, 627 F.2d 1015, 1021-22 (9th Cir.1980); O'Neil v. Baine, 568 S.W.2d 761 (Mo. 1978). One of the principal objectives of the compulsory-retirement provisions of section 632 of the Foreign Service Act of 1946 (60 Stat. 1015, as amended, 22 U.S.C. § 1002) was "to create predictable promotion opportunities and thus spur morale and stimulate superior performance in the ranks... ." Vance v. Bradley, 440 U.S. 93, 98, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). Perry again approves such a legislative purpose because it implicitly "assume[s] ... that older persons, simply by virtue of being older ..., have had a turn, and younger persons deserve a turn too. They too need a turn. Thus, age can be said to determine need." Perry, supra at 1155 (emphasis in original).
A final objective behind the state's enactment was to reduce the costs of premiums. This was the "overall goal" of the legislature in enacting the 1979 amended act. W. Sadowski, J. Herzog, R. Butler, R. Gokel, The 1979 Florida Workers' Compensation Reform: Back to Basics, 7 F.S.U.L.Rev. 641, 650 (1979). Such a goal is also not, under the rational basis test, an illegitimate or irrelevant consideration. Since it is well recognized that the aged are "more prone to on-the-job injuries, it is reasonable to conclude that the employer's disability costs are increased." Equal Employment Opportunity Commission v. Wyoming, ___ U.S. ___, ___, 103 S.Ct. 1054, 1070, 75 L.Ed.2d 18 (1983) (Burger, C.J., dissenting).
While the apparent primary reason for the statute fails the rational basis test, other potential objectives of the statute survive it. "Where, as here, there are plausible reasons for ... [the legislature's] action, our inquiry is at an end. It is, of course, `constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,' ..., because [the] Court has never insisted that a legislative body articulate its reasons for enacting a statute." Fritz, 449 U.S. at 179, 101 S.Ct. at 461. All that is required is that the statute have some reasonable basis, Dandridge, 397 U.S. at 485-86, 81 S.Ct. at 1161-62. We therefore conclude that the statute satisfies this test.

*221 2. Old Age is Not a Quasi/Suspect Class Under the Florida Constitution's Equal Protection Clause.
The statute's satisfaction of the reasonable basis test does not necessarily mean that the challenged state action passes other standards of equal protection. Our attention is now focused on determining whether the class discriminated against is one worthy of heightened review under the Florida equal protection clause. After a careful reading of both the federal and Florida documents, and the cases interpreting them, we are unable to conclude that the state constitution confers upon the aged the status of a quasi-suspect classification, and, therefore, one deserving of a more exacting scrutiny than that accorded to the class by the rational basis standard.
In so deciding, we note that age has not as yet, for federal equal protection purposes, been determined either a suspect or quasi/suspect class. Although the Florida clause provides greater protections to its citizenry than its federal counterpart, as discussed in greater detail, infra, we will nevertheless follow federal guidelines to aid our initial task of identifying the criteria for determining whether a class may be considered suspect, since it was the intention of the framers that our clause operate in a manner similar to that of its federal prototype. Bailey v. Ponce de Leon Port Authority, 398 So.2d 812, 814 (Fla. 1981). In so doing, we find that "the absence of specific reference to age in the Fourteenth Amendment does not alone insulate age classifications from constitutional scrutiny any more than does the absence of mention of poverty or residency for example." Weiss v. Walsh, 324 F. Supp. 75, 77 (S.D.N.Y. 1971), aff'd mem., 461 F.2d 846 (2nd Cir.1972), cert. denied, 409 U.S. 1129, 93 S.Ct. 939, 35 L.Ed.2d 262 (1973).
Precisely how a class of individuals becomes suspect is not totally clear. Comment, Quasi-Suspect Classes and Proof of Discriminatory Intent: A New Model, 90 Yale L.J. 912, 916 (1981) [hereinafter: Quasi-Suspect Classes]. Justice Stone, in a footnote, crafted what appears to be the source from which the theory of constitutionally suspect classes was derived:
[L]egislation which restricts those political processes which can ordinarily be expected to bring about repeal of undersirable legislation, [may] be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation... .
[S]imilar considerations [may] enter into the review of statutes directed at particular religions,... or national, ... or racial minorities... . [P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.
United States v. Carolene Products Co., 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 783-84 n. 4, 82 L.Ed. 1234 (1938) (emphasis supplied).
The "discrete and insular minorities" referred to by Justice Stone, and described by subsequent cases, focus on three characteristics of the class, including: (1) immutable characteristics; (2) historical disadvantage, and (3) relative lack of political representation. Tribe, supra at § 16-22; see also, San Antonio Independent School District v. Rodriguez, 411 U.S. at 104-05, 93 S.Ct. at 1333-34 (Marshall, J., dissenting); Quasi-Suspect Classes, supra, at 917-18.
There are no less than three additional factors, not totally apparent in the case law, but inherent in the reasoning that a class is deserving of some degree of heightened judicial scrutiny. First, legislative attention through anti-discrimination statutes may assist a court in ascertaining whether a class is suspect. Nelson v. Miwa, 56 Haw. 601, 546 P.2d 1005, 1010 (1976); see also, Frontiero v. Richardson, 411 U.S. 677, 687-88, 93 S.Ct. 1764, 1770-71, 36 L.Ed.2d 583 (1973). Moreover, by reviewing the various classes found to be deserving of even a modicum of heightened scrutiny, such as race, alienage, or sex, we find two additional components that provide assistance. *222 Second, the class members usually, though not always, have involuntarily entered the class.[26] Third, the members of the class usually have physically, identifiable characteristics distinguishing them from the rest of society.
Classes of individuals that do not satisfy all of the suspect class factors have been found to be deserving of heightened judicial scrutiny, but the level of scrutiny does not rise to the level of judicial attention given truly suspect classes such as race. Mississippi University for Women, ___ U.S. at ___ n. 9, 102 S.Ct. at 3336 n. 9, 73 L.Ed.2d at 1098 n. 9. Gender is such a class and has been viewed as a "quasi-suspect" class. Tribe, supra, at § 16-26. The quasi-suspect class concept has been recognized under both the federal[27] and Florida equal protection clauses.[28]
The United States Supreme Court nonetheless has rejected age as being suspect, because "old age does not define a `discrete and insular' group ... in need of `extraordinary protection from the majoritarian political process.' Instead, it marks a stage that each of us will reach if we live out our normal span." Massachusetts Board of Retirement v. Murgia, 427 U.S. at 313-14, 96 S.Ct. at 2566-2567, 49 L.Ed.2d at 525 (1976). The Court continued, observing
that a suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a "history of purposeful unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities. The class subject to the compulsory retirement feature of the Massachusetts statute consists of uniformed state police officers over the age of 50. It cannot be said to discriminate only against the elderly. Rather, it draws the line at a certain age in middle life.
427 U.S. at 313, 96 S.Ct. at 2567, 49 L.Ed.2d at 525.
Nevertheless, the Murgia Court was concerned only with the federal equal protection clause. Florida's document, as previously observed, affords greater protections to explicit classes of persons, based on considerations of race, religion and the physically handicapped. Art. I, § 2, Fla. Const. (1968). The text of the fourteenth amendment does not of course identify any suspect classes. Although textual differences between state and federal constitutions have on many occasions alerted state judges of the need for invoking more rigorous state constitutional standards than provided by the federal Bill of Rights, Collins, Reliance on State Constitutions  Away From a Reactionary Approach, 9 Hastings Const. L.Q. 1, 11 n. 38 (1981), we are not convinced that the framers' inclusion of the three suspect classes under the 1968 Florida Constitution requires the determination that they thereby intended that legislation creating age-based distinctions is to be accorded a different level of scrutiny than it is subjected to under the fourteenth amendment, which is of course the rational basis test.
In so saying, we follow Florida Supreme Court precedent. In White Egret Condominium v. Franklin, the court was asked to decide whether a provision in a condominium agreement could, consistent with the equal protection clause of the United States *223 Constitution, restrict children under the age of 12 from residing on the condominium premises. Although it was confronted only with a construction of the federal clause, we consider, from our examination of the broad language used in the opinion, that the court has employed the same standard to test the constitutionality of aged-based classifications as has the United States Supreme Court. Note the following:
In our view, age restrictions are a reasonable means to identify and categorize the varying desires of our population. The law is now clear that a restriction on individual rights on the basis of age need not pass the "strict scrutiny" test, and therefore age is not a suspect classification. See Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). We do recognize, however, that these age restrictions cannot be used to unreasonably or arbitrarily restrict certain classes of individuals from obtaining desirable housing. Whenever an age restriction is attacked on due process or equal protection grounds, we find the test is: (1) whether the restriction under the particular circumstances of the case is reasonable, and (2) whether it is discriminatory, arbitrary, or oppressive in its application.

379 So.2d at 351 (emphasis supplied). These statements seem to us to be an adoption of the rational basis test. Compare the above language with that in Pinillos, 403 So.2d at 367 (applying the rational basis test under the equal protection clauses of both constitutions in determining the constitutionality of medical malpractice legislation (section 768.56) which abolishes the collateral source rule): "The rational basis test requires that a statute bear a reasonable relationship to a legitimate state interest, and the burden is on the challenger to prove that a statute does not rest on any reasonable basis or that it is arbitrary."
The Florida Supreme Court's latest interpretation of article I, section 2, in Schreiner v. McKenzie Tank Lines further supports our view that the clause was not intended to provide greater protections to the aged than those furnished by the federal clause. Although the court was there asked to decide whether the deprivation clause was designed to protect the physically handicapped from private, as well as governmental discrimination, the following language used by the court strongly implies that the court will not in general give a broader construction to Florida's equal protection clause than that given the federal model: "[T]he framers of this constitutional provision did not intend that article I, section 2, have a broader application than the related provision of the fourteenth amendment to the United States Constitution." 432 So.2d 567 at 568. In holding that the framers of the clause intended to protect the handicapped against state action only, the court was greatly influenced by its examination of the draft and transcripts of the Constitutional Revision Commission. We have examined the same documents and similarly find an absence of any expression by the drafters to accord a different standard of scrutiny to the aged. See particularly Draft of Proposed 1968 Constitution, July 20, 1968, at 1: Florida State Archives RG 005, Series 725, Box 1, file 19.
There are no doubt strong policy arguments for requiring a more heightened level of scrutiny. Justice Marshall's dissent in Murgia represents an outstanding example of such a position:
While depriving any government employee of his job is a significant deprivation, it is particularly burdensome when the person deprived is an older citizen. Once terminated, the elderly cannot readily find alternative employment. The lack of work is not only economically damaging, but emotionally and physically draining. Deprived of his status in the community and of the opportunity for meaningful activity, fearful of becoming dependent on others for his support, and lonely in his new-found isolation, the involuntarily retired person is susceptible to physical and emotional ailments as a direct consequence of his enforced idleness. Ample clinical evidence supports the conclusion that mandatory retirement poses *224 a direct threat to the health and life expectancy of the retired person, and these consequences of termination for age are not disputed by appellants. Thus, an older person deprived of his job by the government loses not only his right to earn a living, but, too often, his health as well, in sad contradiction of Browning's promise: "The best is yet to be,/The last of life, for which the first was made."
427 U.S. 323-324, 96 S.Ct. at 2572.
Indeed, the Senate Committee on Aging, in amending the Age Discrimination in Employment Act of 1967, commented:
From the evidence presented, the committee concludes that "age" should be as protected a classification as race and sex. The argument that everyone ages and no particular group is singled out for discrimination ignores the fact that discrimination solely on the basis of age is wrong. If mandatory retirement because of age  the final step in the practice of age discrimination  is not to be declared unconstitutional by the Courts, then Congress should act to make such a practice illegal.
See Senate Committee on Aging, Mandatory Retirement: The Social and Human Cost of Enforced Idleness at 37-38 (August 1977) (emphasis supplied), cited in U.S.E.E.O.C. v. County of Calumet, 519 F. Supp. 195, 199 (E.D.Wis. 1981).
Although, as we have previously observed, the appellant has no standing to attack the wage-loss limitation under the A.D.E.A. because, at the time of his injury, he was beyond the age stated in the federal act, see n. 6, supra, those who are covered may have a remedy under the federal act to contest conflicting state statutes allegedly disadvantaging them. See Equal Employment Opportunity Commission v. Wyoming. Insofar as the applicability of Florida's equal protection clause to the elderly, however, we are constrained by what we perceive to be the controlling interpretations of it by our supreme court, testing the constitutionality of age-classifications by the rational basis standard. Any policy decision according greater benefits to the aged under the Florida document must, therefore, come from that court  not ours.
AFFIRMED.
ROBERT P. SMITH, Jr., C.J., and SHAW, LEANDER, J., Jr., Associate Judge, concur.
NOTES
[1] U.S. Const. amend. XIV, § 1; Art. I, § 9, Fla. Const.
[2] U.S. Const. amend. XIV, § 1; Art. I, § 2, Fla. Const.
[3] Art. I, § 21, Fla. Const.
[4] 81 Stat. 602, as amended, 29 U.S.C. § 621 et seq. (1976 ed. and Supp. IV). The claimant lacks standing to seek relief under the ADEA. See note 6, infra.
[5] See also Radney v. Edwards, 424 So.2d 956 (Fla. 1st DCA 1983); John v. GDG Services, Inc., 424 So.2d 114 (Fla. 1st DCA 1982); Noel v. M. Ecker & Co., 422 So.2d 1062 (Fla. 1st DCA 1982); Mahoney v. Sears, Roebuck & Co., 419 So.2d 754 (Fla. 1st DCA 1982); Acton v. Ft. Lauderdale Hospital, 418 So.2d 1099 (Fla. 1st DCA 1982); Mathis v. Kelly Constr. Co., 417 So.2d 740 (Fla. 1st DCA 1982); Rhaney v. Dobbs House, Inc., 415 So.2d 1277 (Fla. 1st DCA 1982); and Miami-Dade Water & Sewer Authority v. Cormio, 388 So.2d 1238 (Fla. 1st DCA 1979), aff'd. sub nom., Rollins v. Southern Bell Telephone and Telegraph Co., 384 So.2d 650 (Fla. 1980).
[6] Because the claimant was 78 years of age at the time of his injury, and nearly 80 when his claim for wage-loss benefits was submitted and denied, he is not within the affected class for purposes of standing to challenge the age/wage-loss provision as in contravention of ADEA. That law affects only individuals between the ages of forty and seventy. See 29 U.S.C. § 631(a). Further, there is serious question whether or not the claimant could raise this point on appeal, since this ground was not presented below. The issue appears facially statutory and nonconstitutional in nature, although we do acknowledge the existence of a hidden constitutional issue. Whether section 440.15(3)(b)3.d., Florida Statutes, contravenes the U.S. Constitution's Supremacy Clause, Article VI, Clause 2, by being contrary to ADEA is unclear. See, however, Equal Employment Opportunity Commission v. Wyoming, ___ U.S. ___, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983).
[7] See, e.g., Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093 (1947); Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 583, 55 S.Ct. 538, 539-40, 79 L.Ed. 1070 (1935).
[8] See, e.g., Allied Stores of Ohio v. Bowers, 358 U.S. 522, 527, 79 S.Ct. 437, 441, 3 L.Ed.2d 480 (1959).
[9] At least one modern Florida case predates Reed. Apparently decided on the basis of the U.S. Constitution, Daniels v. O'Connor, 243 So.2d 144, 146 (Fla. 1971), applied the substantial relationship standard in a case involving a statute providing for a mental examination as to sanity of a criminal defendant. Curiously, Daniels relied on two prior Florida Supreme Court cases, neither of which applied the substantial relationship standard. See also Hunter v. Flowers, 43 So.2d 435, 437 (Fla. 1949).
[10] The court relied on Daniels. See Note 9.
[11] Contrast earlier Florida cases, equating a "just relation" standard to a "reasonable basis" requirement. State v. Canova, 123 So.2d 672, 673 (Fla. 1960); Eslin v. Collins, 108 So.2d 889, 891 (Fla. 1959).
[12] Compare Justice Powell's reference to the substantial relationship standard as a "marginally more demanding scrutiny" then the traditional reasonable basis standard. Schweiker v. Wilson, 450 U.S. 221, 245, 101 S.Ct. 1074, 1088, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting).
[13] Schreiner, at 716.
[14] Osterndorf, 426 So.2d at 543.
[15] One noted constitutional commentator views the rational basis test as paying nothing more than "lip service" to judicial review; that the test is nothing more than a "hands off" attitude taken by the courts. Gunther, The Supreme Court 1971 Term-Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a New Equal Protection, 86 Harv.L. Rev. 1, 21 (1972). The reason for this rather harsh attitude is that "[v]irtually any legitimate legislative goal advanced will be accepted under this method of review, and little is required in the way of factual justification. Hypothetical facts, arguments, and purposes often are accepted." Comment, Equal Protection and Due Process: Contrasting Methods of Review Under Fourteenth Amendment Doctrine, 14 Harv.C.R.-C.L.L.Rev. 529, 534 (1979).
[16] Gleaning the legislative purpose could potentially result in acceptance of an objective never actually contemplated by a legislative body in enacting the statute. Precisely, this type of problem has generated significant conflict within the Court concerning whether the rational basis test should be applied to only the actual, specifically identifiable purpose, or the objective of a statute as contemplated by the legislative body, and evidenced by the statute's history or implicit in its statutory scheme. See Schweiker, 450 U.S. at 244, 101 S.Ct. at 1087-88 (Powell, J., dissenting). The potential flaw in considering only the actual, legislatively contemplated purpose under the rational basis test is that many times the actual statutory purpose or objective is unknown and therefore cannot be identified. United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 181, 101 S.Ct. 453, 462-63, 66 L.Ed.2d 368 (1980) (Stevens, J., concurring). If no purpose is apparent, the Schweiker minority would employ a "marginally more demanding scrutiny" by requiring that the "classification bear a `fair and substantial relation' to the asserted purpose... ." Schweiker, 450 U.S. at 244-45, 101 S.Ct. at 1088; see also Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 682 n. 3, 101 S.Ct. 1309, 1314 n. 3, 67 L.Ed.2d 580 (1981) (Brennan, J., dissenting). For an excellent review on the developing conflict between members of the Court on this issue, see Leedes, The Rationality Requirement of the Equal Protection Clause, 42 Ohio St.L.J. 639 (1981).
[17] The net effect of the legislature's adding the clarifying language and narrowing the affected class to those individuals aged 65 or older, and entitled to O.A.S.I. benefits is negligible, because approximately 93% of such persons are eligible to collect social security benefits. See H.R.Conf.Rep. No. 95-837, 95th Cong., 1st Sess., reprinted in [1977] 3 U.S.Code Conf. & Ad.News 4155, 4158.
[18] Note that the equal protection analysis under both the Florida and federal constitutions requires not only that we ascertain that there be some reasonable basis for the classification, but also that the classification further a legitimate state purpose or objective. As part of this analysis, both constitutions require that we determine that a possible objective for a classificatory scheme is a legitimate state purpose. See Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); Ostendorf, 426 So.2d 539.
[19] We distinguish this situation from one involving social security disability benefits. Offsetting state workers' compensation disability benefits with federal social security disability benefits presents a wholly different situation and has been held constitutional. American Bankers Ins. Co. v. Little, 393 So.2d 1063 (Fla. 1980); § 440.15(10), Fla. Stat. (1979). Also distinguishable is the case of the worker who tries to collect workers' compensation and unemployment compensation benefits, which is not permissible, Section 440.15(11), Florida Statutes (1979), and is viewed as an attempt to collect inconsistent benefits, one being collected by individuals completely physically able to work; the other collected by those who are at best only partially physically able to work. See Miami Originals, Inc. v. Ruiz, 171 So.2d 172 (Fla. 1965).
[20] Social Security Bd. v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946).
[21] Ponath v. Hedrick, 22 Wis.2d 382, 126 N.W.2d 28, 31 (1964).
[22] It is conceivable that this provision of federal law may preempt the right of the state to cut off wage-related-fringe-benefits for individuals aged 70 or older. Because the age/wage-loss provision was not attacked as violative of the Supremacy Clause, U.S. Constitution, Article VI, Clause 2, we do not address this issue. But cf. Raskin v. Moran, 684 F.2d 472 (7th Cir.1982).
[23] Note, The Cost of Growing Old: Business Necessity and the Age Discrimination in Employment Act, 88 Yale L.J. 565, 568 n. 17, 576-577 nn. 51-55 (1979).
[24] Perry's explication of the rational basis test is that "government [may not] ... treat any person differently from any other person on the basis of any factor that is neither a determinant of, nor a proxy for a factor that is a determinant of, any relevant aspect of a person's moral status." Perry, supra at 1148 (emphasis omitted). Moral status in turn is defined as "the nature and extent of the person's activities, native talents, acquired skills, and needs." Id. at 1138. Therefore, if a factor does not indicate anything about a person's needs, skills, etc., it is, under Perry's analysis, irrelevant to any evaluation of the person's moral status. Id. at 1139. Government, however, for the sake of administrative convenience, may legitimately substitute a proxy for a factor which is a determinant of a person's moral status. Id. at 1148.
[25] The more drastic step of creating a mandatory retirement age, at least for public employees, has been found to be valid under the equal protection clause. See Daoang v. Dept. of Education, 63 Haw. 501, 630 P.2d 629 (1981); DeShon v. Bettendorf Community School Dist., 284 N.W.2d 329 (Iowa 1979).
[26] An exception to this rule is the illegal alien. See Plyler v. Doe, 457 U.S. 202, ___ n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786, 800 n. 19 (1982).
[27] Mississippi University for Women (sex).
[28] State, Dept. of Health and Rehabilitative Services v. West, 378 So.2d 1220 (Fla. 1979) (implicit recognition of illegitimate children as quasi-suspect under state constitution); Purvis v. State, 377 So.2d 674 (Fla. 1979) (explicit recognition of sex as quasi-suspect under state constitution).